716 P.2d 393

**STATE of Arizona, Appellee,**

v.

**William Carl MAURO, Appellant.**

**No. 6329.**

Supreme Court of Arizona,
En Banc.

Feb. 25, 1986.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, and Diane Hienton, Asst. Attys. Gen., Phoenix, for appellee.

Ratner & Walsh by Kathleen Walsh, Flagstaff, for appellant.

HAYS, Justice.

Appellant, William Carl Mauro, was convicted of one count of first degree murder, A.R.S. § 13–1105, and one count of child abuse, A.R.S. § 13–3623. He was sentenced to death for the murder conviction and to a term of 28 years for the child abuse conviction. The sentences were to run consecutively. We have jurisdiction pursuant to A.R.S. §§ 13–4031 and –4035.

The facts from the record follow. On November 23, 1982, Mauro and his family were eating breakfast when appellant's seven-year-old son David began crying and screaming. David was in the bathroom where he had been imprisoned for several days by his father. Mauro told his wife that he would make the boy be quiet. Mauro went into the bathroom and forced a rolled child's sock and two cloths down the boy's throat, thus suffocating the child. Mauro then went to a bedroom and returned with a suitcase in which he placed the child's body. As he left the family trailer with the suitcase, he told his wife to "pray."

After leaving the trailer, Mauro was observed carrying the suitcase through the residential neighborhood surrounding his home. Despite it being a very cold morning, appellant was wearing neither a coat nor shoes. When he reached an empty field, Mauro buried the suitcase under logs in a woodpile.

About one and one-half hours after he was seen near the field, Mauro appeared at a K-Mart store. There he asked employees to call the police. Flagstaff police received a call from an employee who said a man had entered the store claiming to have killed something. The employee described the man as being very excited and delirious. Several witnesses heard Mauro claim to have killed the devil and to have put him in a suitcase, but that he was still moving. Later, Mauro told these same witnesses that he had killed the devil, his son. Once again the K-Mart employee called the police to add this admission. He stated that Mauro was "out of it" and "really afraid."

When the police arrived, Mauro continued to claim that he had killed his son who was possessed by the devil. He insisted on showing police where the suitcase was concealed. Mauro told the officers that he'd take the "rap," and that "I know I'll get executed or go to the penitentiary, but I had to do it." He helped officers locate the suitcase and was then taken to the police station. Because of Mauro's behavior and the small size of the suitcase, officers were unwilling to open the suitcase until a bomb expert could examine it. When the bomb expert discovered the body, Mauro was taken back to the scene and formally arrested.

An autopsy of David's body revealed that he had died of asphyxiation. Although he was seven years old, David weighed only 38 pounds and was 46.2 inches tall. He had numerous bruises and abrasions over his body, some of which were recent. Additionally, marks on his ankles were consistent with having been bound, and he showed signs of malnutrition. Finally, the

wounds on David's body indicated a struggle shortly before death, including strong resistance to the sock being placed in his mouth.

Mauro's sole defense at trial was insanity. As a result of this court's decision in *State v. Coconino County Superior Court, Division II* (Mauro), 139 Ariz. 422, 678 P.2d 1386 (1984), the State retained the burden of proof on this issue. Testimony at trial revealed that Mauro had a history of mental problems, going back at least as far as 1970. He had been hospitalized at least ten (10) times during those years, including once in Flagstaff in February 1982, nine months before the killing. His mother also had a history of mental problems. Specifically, she had been diagnosed as a manic depressive (now known as bipolar affective disorder).

At the request of his court-appointed attorney, Mauro was seen by his Flagstaff psychiatrist, Dr. Dean Gerstenberger, on the day of the killing. Later, Dr. Gerstenberger was appointed by the court to evaluate appellant's competency to stand trial and his legal sanity at the time of the killing. At trial, the doctor testified that Mauro had slipped into a psychotic state some days prior to the killing and had remained there for some weeks after the episode. Dr. Gerstenberger further testified that appellant was legally insane under the M'Naghten rule when he killed David. He based this determination primarily on testimony regarding Mauro's behavior prior to the murder. Specifically, testimony revealed that Mauro spoke of space creatures outside the trailer which planned to take his family's souls; that he paced the floor all night, "pleading the blood"; that his wife's sister had come in spirit to take over his wife's soul; and that he had repeatedly rolled around on the floor. In light of this evidence, Dr. Gerstenberger diagnosed appellant as suffering from a bipolar affective disorder.

Dr. Michael Cleary, a Phoenix psychiatrist nominated by the State, was also appointed by the court to evaluate appellant. He testified that Mauro had a compulsive personality disorder with paranoid features and was not insane under the M'Naghten test. On cross-examination, the doctor stated that he had some doubt about appellant's sanity at the time of the killing, but he acknowledged that appellant was in a disturbed state of mind and was probably hallucinating during the two or three days prior to the killing. However, the doctor stated that the evidence of concealment of the body shows that Mauro knew right from wrong.

## I. SEVERANCE

Prior to trial, appellant moved to sever the premeditated murder count in the indictment from the child-abuse count. A decision to grant denial of a motion to sever is within the sound discretion of the trial court and will be reversed only if that discretion is abused. *State v. Cruz*, 137 Ariz. 541, 544, 672 P.2d 470, 473 (1983). In deciding whether to grant the severance, the trial court weighs the possible prejudice to the defendant against the interests of judicial economy. *Id.*

First, appellant raises as error the court's refusal to sever the two counts in order to permit a fair determination of guilt under Rule 13.4(a), Rules of Criminal Procedure, 17 A.R.S. Appellant argues that joinder of the counts allowed the state to overcome the marital privilege statute which gives one spouse the right to keep the other spouse off the stand as a witness. A.R.S. § 13–4062(1). Specifically, appellant contends that the child-abuse count permitted spousal testimony to be introduced into evidence because the marital privilege is unavailable in a criminal proceeding "in which child neglect, dependency, abuse or abandonment is in issue." A.R.S. § 13–3620(D). The trial court denied appellant's motion to sever, stating that the killing of a child from the marriage is so hostile and antagonistic to the purposes of the marriage that the privilege should not apply. We agree with the trial court that even in the absence of the child-abuse count, the privilege would not apply.

■ The matrimonial privilege is unavailable when a spouse kills a child of the marriage. *State v. Ulin,* 113 Ariz. 141, 145, 548 P.2d 19, 23 (1976); *State v. Figueroa,* 122 Ariz. 190, 192, 593 P.2d 940, 942 (App.1979). Evidence was presented at trial revealing that both spouses engaged in acts of child abuse; however, only one parent committed the homicide. It is therefore unnecessary for us to address the argument as to whether the same result would occur when both parents are codefendants to the homicide. The trial court did not abuse its discretion.

■ Second, appellant claims that the child-abuse count was actually a lesser-included offense of the murder charge and, therefore, should not have been included in the indictment. The issue of lesser-included offense was not advanced at the trial level and therefore defendant has waived the issue. *State v. Thomas,* 130 Ariz. 432, 435, 636 P.2d 1214, 1217 (1981).

■ Finally, appellant claims that he was entitled to severance as a matter of right under Rule 13.4(b), Rules of Criminal Procedure, 17 A.R.S. This argument is entirely without merit. Entitlement to severance by right is only available to offenses joined under Rule 13.3(a)(1). *See* Rule 13.-4(b). The two counts were joined under the "same conduct" provision of Rule 13.3(a)(2) and not the "same or similar character" provision of Rule 13.3(a)(1). The indictment was amended to allege that both the homicide and the child abuse involved the use of a dangerous instrument: "one white child's sock with two stripes and one white cloth measuring approximately 24 inches by 24 inches." (This cloth was referred to at trial as a diaper). The prosecution chose to charge appellant with only the actions of abuse that ultimately led to the death of David. Thus, since both charges were based on the "same conduct," the severance request was properly denied.

## II. VOIR DIRE

Appellant contends that there was an insufficient voir dire concerning the insanity defense and various religious issues in the case. Prior to the voir dire, both the prosecution and defense submitted extensive lists of voir dire questions to the trial judge. The court refused to ask any of the questions submitted by the defense on religion. From almost fifty questions submitted by both the prosecution and defense on insanity, the judge asked only one. He added another of his own to the list.

■ The scope of voir dire is left to the sound discretion of the trial court. *State v. Tims,* 143 Ariz. 196, 198, 693 P.2d 333, 335 (1985). Absent a clear abuse of discretion, limitation of voir dire will not be adjudged error on appeal. *Id.* Rule 18.5(d) provides that the trial court "shall conduct the voir dire examination, putting to the jurors all appropriate questions requested by counsel." *See State v. Chaney,* 141 Ariz. 295, 303–04, 686 P.2d 1265, 1273–74 (1984).

In *State v. Chaney, supra,* we upheld a voir dire on an insanity issue which also consisted of only two questions. 141 Ariz. at 303, 686 P.2d at 1273. The first question in *Chaney* differed from that in this case. In *Chaney,* the court asked:

Are any of you acquainted with anyone who has been treated for having a mental disorder, a neurological disorder, or a brain disorder?

*Id.* Both the defense and the prosecution submitted questions that paralleled this inquiry but they were not asked. We find the questions to be direct and relevant. However, because we dispose of the case on other grounds, we need not decide if it was an abuse of discretion for the trial court to refuse to ask them.

■ Although we need not decide if the court's voir dire on insanity was sufficient to avoid error, we believe that, in the future, trial courts should broaden the scope of their inquiry to extend beyond the minimum due process demands of "putting to jurors all appropriate questions requested by counsel." *See State v. Chaney,* 141 Ariz. at 303–04, 686 P.2d at 1273–74 (quoting Rule 18.5(d)).

■ Appellant also urges that the court's refusal to ask any of the proposed questions concerning religious issues amounted to prejudicial error. This court has recently held that the religious faith, affiliation and beliefs of a prospective juror are a proper subject of inquiry on voir dire in certain cases. *State v. Via*, 146 Ariz. 108, 117–18, 704 P.2d 238, 247–48 (1985); *see* 47 Am.Jur.2d *Jury* § 283. Specifically, in analyzing a case, we must consider whether there is a nexus between the prejudice feared and an issue in the case. *State v. Skaggs*, 120 Ariz. 467, 586 P.2d 1279 (1978).

The record in this case reveals the court's concern about questioning jurors on religion as it related to the case. Further, the court apparently found defense counsel unable to articulate exactly what prejudice was feared:

The court:

. . . .

It's so vague. The case involves religious beliefs which you may or may not espouse. What sacrament, using water instead of wine? They would have no idea what you are talking about. Would the fact that this case concerns certain religious beliefs affect your ability to serve as a fair and impartial juror in this matter? If I were on that panel and you asked me that question, I wouldn't have the foggiest idea what I was being asked or how I could fairly respond.

. . . .

You might think about it some more and try to give me a question I can use, but these are improper and I won't ask them. I think they are unfair and improper.

Appellant alleges he was prejudiced by the court's refusal to ask the questions on religion. However, the court did not refuse to voir dire the jury on religion; it refused only to ask those questions which amounted to argument. In *State v. McMurtrey*, 136 Ariz. 93, 98–99, 664 P.2d 637, 642–43, *cert. denied*, 464 U.S. 858, 104 S.Ct. 180, 79 L.Ed.2d 161 (1983), this court held that it is not an abuse of discretion to

refuse to ask questions that are argumentative.

■ Further, questions as to the religious beliefs and associations of veniremen are improper unless they are directed at specific prejudice. *See State v. Via*, 146 Ariz. at 118, 704 P.2d at 248. In the instant case, appellant's questions apparently were pointed at generalized fears concerning witchcraft and satanism. For example, defense counsel stated:

If the testimony comes out that my client was practicing witchcraft and satanism and we have a prospective juror on there that has feelings against that and goes into the jury room and convicts because of his view concerning those types of practices, I think we have a problem.

In reviewing the proposed questions, the trial court concluded that counsel had not sufficiently drafted the questions so that a juror could understand them. Rather, the court found them both vague and unfair. We agree and therefore find it was not an abuse of discretion to reject them.

## III. FIFTH AMENDMENT CLAIMS

Appellant asserts that the admission of a tape-recorded conversation between himself and his wife violated his state and federal rights not to incriminate himself. U.S. Const. amend. V, XIV; Ariz. Const. art. 2, § 10. We agree and reverse on this issue.

After the discovery of the body, appellant was driven by police officers back to the field by the K-Mart. Detective Allen formally arrested appellant and advised him of his Miranda rights. Allen then asked appellant if he understood those rights and appellant replied that he did. When appellant was transported to the police station, he was once again advised of his Miranda rights at 10:45 a.m. At that time, appellant told the officers that he did not wish to make any statements without the presence of an attorney. That conversation was recorded but not admitted into evidence at the trial.

While appellant was being held in the captain's office, Mrs. Mauro was being

questioned in another room. During that questioning, Mrs. Mauro told Detective Manson that her husband had a history of mental illness. Further, she related accounts of various acts of discipline that might constitute child abuse. Mrs. Mauro detailed appellant's behavior prior to and after the homicide, including claims that he saw spacemen. At the end of the questioning, she requested that she be able to talk with her husband.

At around 11:00 a.m. Detective Manson approached Detective Allen and discussed Mrs. Mauro's request to speak to her husband. Manson told him that he didn't think it was a very good idea to allow the two to meet. Allen disagreed with Manson and allowed the visit. He directed Manson to be present when the conversation took place and to tape-record it. Allen testified that he wanted Manson present for security and because at that time he "still was in the dark somewhat." He "didn't know if the two of them were involved together in the crime." Therefore, he feared they might concoct stories or get their stories together.

Both detectives testified at pretrial hearings that they were aware that appellant might make incriminating statements. The defense asked Detective Allen:

Q. ... certainly when you sent an officer in there to listen to that conversation, you knew that it was possible that he might make incriminating statements?

A. That's correct.

Q. And obviously, you wanted to record that conversation so as to have a record of those incriminating statements?

A. That's correct.

Later, Detective Manson was asked substantially the same questions:

Q. Frank, certainly you were aware that during the conversation either Linda or my client may have given an incriminating statement?

A. Yes.

Q. And obviously one of the purposes of your tape recording the interview was to take down any such statements?

A. Yes, sir.

Although the detective sat three or four feet from appellant with the tape recorder in plain view, appellant was never told the conversation would be taped. The taped conversation was brief:

. . . . .

MRS. MAURO: Please—please, I don't know what to do. We should have put David in the hospital. Please—I don't know what we're going to do. We should have went for help—we should have went for help.

APPELLANT: You tried as best you could to stop it.

MRS. MAURO: I—

APPELLANT: Shut up.

MRS. MAURO: —taken him to a mental hospital or something. What'll we do?

APPELLANT: Shut up.

DET. MANSON: Do you know a reverend or a priest or someone you can talk to—take care of David?

MRS. MAURO: No.

APPELLANT: Don't answer questions until you get rights of attorney before you find out whats going on. You tried to stop me as best you can. What are you going to do, kill me? You tried the best you can to stop me.

MRS. MAURO: I don't—we don't—I don't have money.

APPELLANT: There's a public attorney.

MRS. MAURO: I don't know.

APPELLANT: There's a public attorney. Why don't you just be quiet.

MRS. MAURO: I don't have any money to bury him. I don't have any money. All I got is enough money for the rent for the children and that's it.

DET. MANSON: Did you want to talk to your husband any more?

MRS. MAURO: No, I can't talk to him.

APPELLANT: Then don't talk to me—get out.

MRS. MAURO: I don't know what to do. O.K.

The trial court found that: 1) the conversation was voluntary; 2) the police did not initiate the conversation; and 3) the tape was highly probative of appellant's sanity or insanity at the time of the crime. Both psychiatrists used this tape in appellant's evaluation.

The right to counsel under the fifth amendment is a protection of the privilege against self-incrimination. *United States v. Gouveia*, 467 U.S. 180, 188 n. 5, 104 S.Ct. 2292, 2298 n. 5, 81 L.Ed.2d 146 (1984). If a person subjected to custodial interrogation invokes his Miranda rights, the interrogation must cease. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981); *State v. Finehout*, 136 Ariz. 226, 229, 665 P.2d 570, 573 (1983).

The state contends that the tape-recorded conversation does not constitute a violation of appellant's rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The cases the State relies upon involve conversations between defendants and their spouses. We disagree that the present case is controlled by these cases. In the Narten cases, *State v. Narten*, 99 Ariz. 116, 407 P.2d 81 (1965), *cert. denied*, 384 U.S. 1008, 86 S.Ct. 1985, 16 L.Ed.2d 1021 (1966), and *Narten v. Eyman*, 460 F.2d 184 (9th Cir.1969), a husband and wife conversation took place in a sheriff's office. An officer was placed nearby to guard the defendant. There was no evidence of any intent to surreptitiously eavesdrop; in fact, the officer was at such a distance that he heard only parts of the conversation. Although this conversation took place after the sixth amendment right to counsel attached, the officer who accidentally overheard the conversation was able to testify. There was no indication that this officer or the state used this conversation as a device to accumulate incriminating evidence.

In *State v. Summerlin*, 138 Ariz. 426, 675 P.2d 686 (1984), a defendant requested that he be able to speak to his wife. The police told him that an officer would have to be present. The record shows no attempt to surreptitiously eavesdrop. Once again, the guarding officer who overheard part of the conversation was able to testify. *Summerlin* only addresses the issue of anti-marital fact privilege and not the right of counsel.

Unlike the Narten cases and *Summerlin*, this is not a case where an officer accidentally overhears a conversation. Rather, here we have illicit custodial interrogation. At the time of the tape recording at issue, appellant was under arrest and being detained at a police station. There is no doubt that this constituted a custodial setting. However, besides being in a custodial setting, the conversation must constitute "interrogation."

Interrogation includes a "practice that the police should know is reasonably likely to evoke an incriminating response from a suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1690, 64 L.Ed.2d 297 (1980). "The focus in ascertaining whether particular police conduct amounts to interrogation, then, is not on the form of the words used, but the intent of the police officers and the perceptions of the suspect." *State v. Finehout*, 136 Ariz. at 230, 665 P.2d at 574. An incriminating response is any response—whether inculpatory or exculpatory—that the prosecution may seek to introduce at trial. *Rhode Island v. Innis*, 446 U.S. at 301 n. 5, 100 S.Ct. at 1690 n. 5.

The intent of the detectives is clear from their own testimony. They both knew that if the conversation took place, incriminating statements were likely to be made. With that in mind, they decided to take in a tape recorder, sit near appellant and his wife and allow the conversation to commence.

Since the intent of the detectives is so clear, we need not address appellant's perceptions. Whether the police knew that appellant was unusually disoriented or upset might have been an important factor in this case had the State's intent not been so

unambiguous. *See id.,* 446 U.S. at 302–03, 100 S.Ct. at 1690 (suspect's peculiar susceptibility to the police appeal and whether the police knew that appellant was unusually disoriented or upset are factors to be examined in determining the perceptions of a suspect). We find, therefore, that in allowing the conversation to commence, the police did indirectly what they could not do directly—interrogate appellant.

Because this problem may arise again, we find it necessary to explain the right of a suspect who has invoked his right to silence. In doing so, we believe that language in a recent United States Supreme Court opinion on the right to counsel under the sixth amendment is equally applicable here:

> [The right to counsel] is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached. [Citation omitted.] However, *knowing exploitation* by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to assistance of counsel as is the intentional creation of such an opportunity.

*Maine v. Moulton,* —— U.S. ——, ——, 106 S.Ct. 477, 487, 88 L.Ed.2d 481 (1985) (emphasis added).

Although appellant's sixth amendment right to counsel had not attached at the time of the conversation, clearly the state could no longer interrogate appellant directly. Equally, the police may not circumvent appellant's right to silence by "exploiting" an opportunity and do indirectly what they could not do directly. Since the police in this instance controlled not only whether the conversation took place, but also the placement of the officer in the room, we cannot condone the use of this tape at trial.

■ The tape may not be admissible at trial; however, the doctors can use this tape in their Rule 11 evaluations. In *State v. Mitchell,* 106 Ariz. 492, 497, 478 P.2d 517, 522 (1970), we allowed an officer to give an opinion as to a defendant's sanity even though that opinion was based partly on a conversation with the defendant which had been suppressed by the trial court. Further, Rule 703, Arizona Rules of Evidence, A.R.S. 17A, specifically provides that facts or data usually relied upon by experts in forming an opinion need not be admissible in evidence.

■ As for presenting this evidence to the jury to formulate the basis of an opinion as to appellant's sanity, we believe the practice set forth by the United States Supreme Court is instructive. In *Wainwright v. Greenfield,* —— U.S. ——, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986), the Court held that it is violative of the due process clause to use a defendant's post-arrest, post-Miranda warnings silence as evidence of sanity. The court interpreted silence to mean "not only muteness" but also "the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted." *Id.* 106 S.Ct. at 640 n. 13. In other words, the state cannot use the words a defendant uses to request an attorney as evidence of sanity. However, the state may, through carefully framed questions that avoid any mention of the defendant's exercise of his constitutional rights to remain silent and to consult with counsel, present evidence that after his arrest, defendant's behavior appeared rational. Likewise, we believe that the state can present evidence that appellant was able to talk rationally after his arrest; however, they cannot make specific reference to this conversation.[1]

## IV. EVIDENTIARY ISSUES

Appellant has raised the admission of various items of evidence and testimony as

---

1. Parts of the tape-recorded conversation probably violated appellant's due process rights under the fourteenth amendment. *See Wainwright v. Greenfield,* —— U.S. at ——, 106 S.Ct. at 639–40 (it is fundamentally unfair for the State to promise in the Miranda warnings that silence will not be used as a penalty, and then to unfairly "trick" him by using as evidence the words of his response at trial). However, since we are disposing of the entire conversation, we do not have to do a piecemeal analysis of it.

constituting fundamental errors. Since we have decided to reverse this case on other grounds, we will discuss only those evidentiary issues which are likely to re-occur on retrial.

## A. *Inflammatory Photographs*

Appellant argues that the trial court committed reversible error by admitting several inflammatory photographs of the victim. He claims that the prejudicial effect of these photographs outweighed their probative value. After holding an evidentiary hearing on the issue, the trial court excluded most of the photographs. However, the court did allow some of the photographs into evidence. These included pictures of the child's body in the suitcase, pictures of the body showing bruises and other marks of abuse, and autopsy pictures of the child with rags in his mouth. There was also a photograph of the child's internal organs showing the placement of the sock in the victim's throat, and the presence of wounds on the victim's lips.

 Inflammatory photographs may be admitted if they are relevant and if their probative value outweighs the danger of unfair prejudice. *State v. Bracy*, 145 Ariz. 520, 533, 703 P.2d 464, 477 (1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 898, 88 L.Ed.2d 932 (1986). The decision to admit these photographs will not be disturbed on appeal absent a clear abuse of discretion. *Id.*

 A trial court's decision to admit photographs is based on the purpose behind the offer. *Id.* Furthermore, even though defense counsel may wish to stipulate to the photographs' contents so as to avoid their use, we cannot compel the state "to try its case in a sterile setting." *State v. Chapple*, 135 Ariz. 281, 289–90, 660 P.2d 1208, 1216–17 (1983).

 In this case, the trial court found that although defense counsel was willing to stipulate to the victim's identity and the method of death, he was not willing to stipulate to premeditation. Premeditation, however, was the basis for the court admitting the photographs. For example, the trial court found that the picture of the body in the suitcase showed "how much control over his actions the defendant had at the times in question." It showed what could not be adequately described by other means. The same is true for the pictures showing signs of child abuse. Additionally, the pictures showing wounds on the victim's lips and the placement of the rags in his throat were admitted to show premeditation and to clearly refute any potential suggestion by the defense that Mrs. Mauro killed the child.[2] Although the photographs were inflammatory in varying degrees, we hold that they were not unfairly prejudicial and, therefore, the trial court did not abuse its discretion in admitting them. *See State v. Bracy, supra.* These photographs supported the state's theory of the case that the killing was premeditated and the climax of a history of abuse. We find no error in admitting inflammatory photographs when issues such as premeditation are not stipulated. *See State v. Bracy*, 145 Ariz. at 534, 703 P.2d at 478.

## B. *Rule 11 Evaluation*

Appellant raised as error testimony concerning two statements he made prior to and during his Rule 11 mental evaluation. The trial court appointed Dr. Cleary to evaluate appellant's competency to stand trial and his mental status at the time of the offense. First, Dr. Cleary testified that appellant refused to see him on his second visit and asked that counsel be present during the evaluation. Further, Dr. Cleary emphasized that this request for

---

**2.** The photograph of the placement of the sock and cloths in the throat was admitted for two purposes: to show premeditation and to refute any suggestion that the wife did the killing. On retrial, unless the defense is clearly raised that Mrs. Mauro committed the homicide and there is evidence that this photograph supports the

proposition that no female could have committed the crime, we do not believe the photograph can be admitted to prove Mrs. Mauro did not kill the child. However, this photograph may be admissible on retrial solely to prove premeditation.

counsel was unusual: "it is a big deal. It's the first time it's happened in 1,000 examinations." Earlier, the court had granted appellant's request that counsel be present during the subsequent evaluation. Second, Dr. Cleary testified that at the beginning of the interview, appellant stated that he "felt like a sitting duck." Appellant argues that the first statement was an impermissible comment on his right to counsel and the second was a violation of Rule 11.7(b), Arizona Rules of Criminal Procedure, 17 A.R.S.

The psychiatric evaluation is a "critical stage" of a proceeding and appellant has a right to counsel in formulating his approach to the examination. *Estelle v. Smith*, 451 U.S. 454, 470, 101 S.Ct. 1866, 1877, 68 L.Ed.2d 359 (1981). However, it appears there is no constitutional right to have an attorney present during a court-ordered psychiatric examination itself. *See id.* at n. 14.

In this case, however, the trial court permitted appellant to have counsel participate in the Rule 11 evaluation. Since we have reversed this case on other grounds, we do not need to reach the ultimate issue of whether the doctor's comment on appellant's request for counsel constituted fundamental error. However, on remand we direct the trial court to restrict the use of this evidence in accordance with the due process analysis of *Wainwright v. Greenfield, supra*. Since the trial court allowed appellant's counsel to be present, and the right to have counsel present at the evaluation is an unsettled question, it seems fundamentally unfair to later use that request as evidence of sanity. However, the jury should be allowed to be told that appellant was unwilling to fully cooperate with Dr. Cleary.

The second comment concerning appellant's feeling like a "sitting duck" is challenged as a violation of Rule 11.7(b)(1) regarding privileged statements. This rule states:

No statement of the defendant obtained under these provisions, or evidence resulting therefrom, concerning the events which form the basis of the charges against him shall be admissible at the trial of guilt or innocence, or at any subsequent proceeding to determine guilt or innocence, without his consent.

The state argues that this was a nontestimonial "verbal act" and therefore not covered by the privilege of Rule 11.7.

Appellant's state of mind at the time of the examination is not a statement "concerning the events which form the basis of the charges." Rather, this statement is probative of appellant's psychological attitude going into the evaluation. We agree, therefore, that its use does not constitute error. However, we believe the use of any statements made by a defendant during such an examination should be strictly avoided. If the exact statement is so important that the prosecution would like to use it during trial, then it is apparently incriminating. Since this rule is to overcome the problem of forced self-incrimination, no statements made during the evaluation should be admitted.

In light of our decision today, it is unnecessary to consider appellant's other issues on appeal. Because appellant's conversation with his wife was improperly used at trial, we reverse the convictions for first degree murder and child abuse and the sentences imposed are vacated. Accordingly, this matter is remanded to the trial court for proceedings consistent with this opinion.

HOLOHAN, C.J., GORDON, V.C.J., and CAMERON and FELDMAN, JJ., concur.