858 P.2d 639

**STATE of Arizona, Appellee,**

v.

**Ronald Dwight SCHACKART, Appellant.**

**No. CR–85–0130–AP.**

Supreme Court of Arizona.

July 22, 1993.

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, Cr. Appeals Section, and Bruce M. Ferg, Asst. Atty. Gen., Phoenix, for appellee.

Charles L. Weninger, Tucson, for appellant.

## OPINION

ZLAKET, Justice.

Defendant appeals from his first degree murder conviction and death sentence. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. §§ 13–4031, –4033 and –4035. We affirm the conviction, but remand for resentencing.

### FACTS AND PROCEDURAL BACKGROUND

On the evening of March 8, 1984, defendant appeared at his pastor's home and stated that he had killed a woman. He told the pastor that he intended to call the police, but first wanted to inform his mother. The two men drove to her home, where defendant disclosed what had happened. The police were then called.

When the officers arrived, they arrested defendant and read him his rights. They took him to the station where he was questioned. In a taped confession, defendant admitted that he had forced the victim to have sexual intercourse with him and thereafter killed her.

Police found the victim where defendant indicated, in a room at the Holiday Inn. Her body was under the covers on the bed. A large sock had been stuffed in her mouth with sufficient force to tear the base of her tongue. Subsequent medical examination revealed that she died of manual strangulation.

According to his confession, defendant and the victim had been friends. They intended to meet for lunch on March 8 to discuss his recent problems. Upon discharge from the army, defendant had allegedly returned home to find his wife in bed with a man. He also had been charged with sexually assaulting his wife, an accusation he denied. Defendant was out of work. He had no place to stay, having just moved from his parents' house following an argument. In an effort to help him, the victim drove defendant to the Holiday Inn so he could rent a room.

They talked for a while in the room. Defendant claimed he became upset think-

ing about his wife and began confusing the victim with her. He pulled a gun out and asked if she would have sex with him. She refused, so he forced her to comply at gunpoint.

The two remained in the room for several hours. When the victim appeared to be sleeping, defendant struck her on the neck with the gun butt, allegedly to knock her out. The blow, however, did not render her unconscious. Instead, she awoke and began screaming. Defendant then strangled her.

Defendant was charged with sexual assault, kidnapping, and first degree murder. Before trial, he offered to plead guilty. The trial judge rejected the plea when defendant refused to admit a sufficient factual basis for it.

Following trial, the jury convicted defendant on all counts, including first degree felony murder. It further found that he intended to kill the victim. An aggravation/mitigation hearing was held on May 3, 1985. On May 10, the court sentenced defendant to consecutive 30–year terms on each of the assault and kidnapping counts, and to death on the murder count. This appeal was filed the same day.

While preparing the record on appeal, the court reporter who had covered the trial and post-trial proceedings (Walters), became unwilling or unable to transcribe his notes. In October, 1985, the trial judge appointed another reporter (Fink) to assist Walters in preparing the transcript. He ordered Walters to cooperate in this effort.

Throughout October and early November, the two reporters collaborated on the transcripts. Fink transcribed Walters' notes to create "rough drafts." Walters then reviewed each draft, making corrections before a final copy was prepared. On one occasion, a witness reviewed a portion of his testimony and made minor corrections. The prosecutor also checked the transcripts for accuracy, but made no changes.

Before the transcripts were completed, Walters left Arizona. Fink finished them on her own and filed them.

On November 3, 1986, the supreme court clerk sent a letter to defendant's appellate counsel, informing him that a transcript of the May 10, 1985 sentencing had not yet been filed. In a letter dated November 26, 1986, appellate counsel informed the clerk that several additional transcripts were missing from the record. The clerk wrote back that those transcripts were not missing but rather had not been designated as part of the record on appeal. Defendant thereafter filed a motion to enlarge the record. This court granted the motion and three additional transcripts were filed on February 2, 1987.

Meanwhile, on January 15, 1987 the superior court ordered that the transcript of the May 10, 1985 sentencing be reconstructed pursuant to Rule 31.8(f), Ariz. R.Crim.P., 17 A.R.S. Thereafter, Fink prepared a "rough draft" transcript of the May 10 proceeding based on Walters' notes. On October 29, 1987, following a hearing at which defendant testified to his recollection of the sentencing, the trial judge issued a minute entry finding that the "rough draft" as corrected by the defendant was "an accurate account" of the sentencing.

On November 12, 1987, Fink filed an affidavit in which she stated:

> In my opinion Mr. Walters was not a competent court reporter. In some instances it appeared that he had been unable to keep up with what was being said, so that words were left out, and in other instances he struck the wrong keys, thereby misspelling words and causing further confusion. He also often failed to identify who was speaking.
>
> . . .
>
> The notes of the sentencing hearing held on May 10, 1985 were even worse than those of the trial. Mr. Walters told me before he left that he had been sick that day, and that the presence in the courtroom of so many people from the news media made him so nervous that he was almost unable to make any notes. The difficulty in deciphering the notes was so great that the production of the

"Rough Draft" of that hearing, which should have taken no more than 2 hours, required 2 solid days of work.

On the basis of this affidavit, defendant moved for a hearing to "ascertain the integrity of the transcripts."

The court held such a hearing on February 16, 1988, at which Fink testified. She stated that although the trial transcript contained frequent mistakes, "[Walters] got the context of what was said." Concerning the May 10, 1985 sentencing, however, she said that Walters' notes were "pretty much" unintelligible.

Shortly thereafter, defendant moved for the appointment of an expert witness to review the transcripts. He also requested that the court order his trial counsel to review the transcripts and prepare a statement of the proceedings pursuant to Rule 31.8(f), Ariz.R.Crim.P., 17 A.R.S. On March 23, 1988, the court denied the request for an expert witness, but ordered defendant's trial counsel to review the transcripts and report their findings to the court. In August, 1988, defense counsel filed statements correcting errors in the transcripts. In early 1989, defendant himself also filed a list of corrections with the trial judge.

On January 31, 1990, the judge issued a detailed order setting out specific corrections to the trial transcripts. Having "read and reviewed all of the transcripts," he found that most mistakes were "relatively minor typographical errors." He then concluded: *"The transcript is a fair and accurate representation of what took place in the trial court during this trial and its corollary proceedings."* Minute Entry, January 31, 1990 (emphasis in original). On February 27, 1990, the clerk of the supreme court issued a notice that the record was complete.

On June 7, 1990, defendant filed another motion to enlarge the record, requesting inclusion of the May 10, 1985 "rough draft," and the transcripts of three hearings in late 1987 and early 1988 regarding the condition of the record. On June 13, 1990, defendant filed a third motion to enlarge, specifying several portions of the trial which were completely missing. These included the testimony of three police officers, a hearing on the admission of gruesome photographs and objects, and discussions regarding several evidentiary matters.

On November 30, 1990, the trial judge issued a status report in which he stated that the transcripts of two hearings regarding the condition of the record would be filed with the supreme court. The third, he said, was telephonic and no court reporter had been present. The judge further indicated that the testimony of the three witnesses, the hearing on the photographs and objects, various evidentiary rulings and a post-trial challenge to the jury panel, had all been located and transcribed by reporter Fink. Finally, he stated that to the best of his knowledge, all evidentiary rulings in the transcripts were sufficient to permit appellate review.

On December 21, 1990, the final transcripts were filed with this court. On January 14, 1991, the clerk again informed appellate counsel that the record was complete.

## CONDITION OF THE RECORD

■ Defendant argues that he is entitled to a new trial because the record is "unavailable" for all practical purposes. In light of the problems with the transcripts in this case, he claims there is no way to state with certainty that they accurately reflect the proceedings.

Rules 31.8(f) and (h), Ariz.R.Crim.P., 17 A.R.S. set out the procedure for correcting errors and reconstructing the record when necessary. Confronted with the prospect of missing and inaccurate transcripts, the trial court utilized these rules and took all reasonable measures to ensure that the record provided a complete account of defendant's trial. The judge found that the transcripts before us fairly and accurately reflect the proceedings below.

We too have painstakingly reviewed the record. Though the saga we have described is most regrettable, we are able to

conclude that the trial transcripts are satisfactory to afford defendant a meaningful right of appeal. Ariz. Const. art II, § 24. The record is not perfect. It is, however, of "sufficient completeness for adequate consideration of the errors assigned." *State v. Moore*, 108 Ariz. 532, 534, 502 P.2d 1351, 1353 (1972). It is also more than adequate to permit a full review for fundamental error.

As the trial judge found, the vast majority of mistakes in these transcripts are typographical. Even in those few places where the transcripts are garbled, the court's rulings and the positions of counsel are nonetheless clear. As reporter Fink testified, Walters "got the context of what was said," even if he did not get every word correct.

■ We do not find persuasive defendant's claim that portions of the record may still be missing. Neither defendant, nor any of his trial or appellate counsel, has been able to identify anything alleged to have occurred prior to the May 10 sentencing that is not sufficiently reported in the present record. *See State v. Masters*, 108 Ariz. 189, 192, 494 P.2d 1319, 1322 (1972) (when a transcript is lost or unavailable, the court will assume that the record supports the judgment unless there is "at least a credible and unmet allegation of reversible error"). If a significant error was committed below, we expect that at least one of defendant's two trial attorneys would have recalled it for the record. Moreover, neither the court clerk's minute entries nor the transcripts themselves allude to any portion of the trial not now transcribed. Along with the participants—defendant, his lawyers, the prosecution, and the trial judge—we discern no significant omissions in the record prior to May 10, 1985.

■ The record of the May 10 sentencing, however, is another matter. It is clearly inadequate to enable a proper review of defendant's death sentence, given the broad scope of our obligation here. *See State v. Fierro*, 166 Ariz. 539, 548, 804 P.2d 72, 81 (1990) (supreme court must independently review death sentence). Although the trial judge's pronouncement of sentence is fully set forth, much of that proceeding—most notably defendant's statement on his own behalf and a statement by defense counsel—was not transcribed. Thus, we must remand for a new sentencing hearing. The trial court need not repeat the aggravation/mitigation hearing, however, because that proceeding was transcribed in full.

## LACK OF INTENT DEFENSE

One of the defenses at trial was lack of an intent to kill, and defendant alleges several errors in this regard. Because the jury found defendant guilty of felony murder, however, such errors would have no bearing on his conviction. *See* A.R.S. § 13–1105(A)(2); *State v. McLoughlin*, 139 Ariz. 481, 485–86, 679 P.2d 504, 508–09 (1984) (felony murder does not require proof of specific intent to kill; *mens rea* is satisfied by the intent required for the underlying felony). Nonetheless, the jury's specific finding that defendant intended to kill does affect his sentence. *See Tison v. Arizona*, 481 U.S. 137, 156, 107 S.Ct. 1676, 1687, 95 L.Ed.2d 127, 143 (1987) ("A critical facet of the individualized determination of culpability required in capital cases is the mental state with which the defendant commits the crime."). Thus, we believe it necessary to address these allegations of error.

## I. APPOINTMENT OF DR. BENDHEIM

■ Defense counsel planned to call Dr. Otto Bendheim, a psychiatrist, to testify regarding his client's mental state at the time of the killing. The state therefore moved to have defendant examined by a mental health expert appointed pursuant to Rule 11, Ariz.R.Crim.P., 17 A.R.S. The trial court denied this motion. On special action, the court of appeals reversed. *State v. Druke*, 143 Ariz. 314, 693 P.2d 969 (Ct.App.1984). The trial court thereafter ordered defendant to submit to a psychiatric examination by Dr. Michael Cleary.

After the court appointed Dr. Cleary, defendant moved for the appointment of a

second expert, pursuant to Rule 11.3(a), Ariz.R.Crim.P., 17 A.R.S., which states that, "[i]f the court determines that reasonable grounds for an examination exist, it shall appoint *at least two* mental health experts ..." (emphasis added). In response, the court appointed as a second expert the same Dr. Bendheim who had already examined defendant and been disclosed as a defense witness. In a motion for rehearing, defendant informed the court that Dr. Bendheim would not accept court appointments. This motion was denied.

■ Defendant argues that the court did not follow the mandate of Rule 11 when it appointed Dr. Bendheim. We do not agree. Rule 11.3(c) states that each party may provide a list of three experts and that the court shall appoint one expert from each list. If a party does not submit a list, the court shall appoint an expert of its own choosing. Because defendant did not provide a list of experts, and thus waived his right to narrow the selection process, the court's choice of Dr. Bendheim was permissible. The fact that the doctor had already been retained by defense counsel did not disqualify him from also being appointed under Rule 11.

Defendant also claims that the appointment of Dr. Bendheim violated Rule 706, Ariz.R.Evid., which prohibits the court from appointing an expert witness "unless the witness consents to act." Other than counsel's representation to the trial court, there is no indication that the doctor refused to accept the court appointment. On the contrary, the record reflects that, following the trial, Dr. Bendheim re-examined defendant in preparation for the aggravation/mitigation hearing, where he again was an expert witness for the defense. He was compensated by the court for these services.

## II. EXAMINATION BY DR. CLEARY

### A. *Right against self-incrimination.*

■ Defendant argues that ordering him to submit to an examination by Dr. Cleary violated his right against self-in-crimination. We believe that a defendant who places his or her mental condition in issue and gives notice of an intention to rely on psychiatric testimony has "opened the door" to an examination by an expert appointed on motion of the state. *See Riles v. McCotter,* 799 F.2d 947, 953–54 (5th Cir.1986); *see also State v. Briand,* 130 N.H. 650, 547 A.2d 235, 239 (1988). The overwhelming majority of federal cases which have addressed the issue hold that a defendant may be compelled to submit to a psychiatric exam when he or she raises the defense of insanity. *See, e.g., Presnell v. Zant,* 959 F.2d 1524, 1534 (11th Cir.1992); *Sturgis v. Goldsmith,* 796 F.2d 1103, 1108 (9th Cir.1986); *United States v. Madrid,* 673 F.2d 1114, 1121 (10th Cir. 1982); *United States v. Albright,* 388 F.2d 719, 723 (4th Cir.1968). Although defendant here did not plead insanity, but sought only to prove lack of intent, we think the reasoning of these cases nonetheless applies. *Cf. Briand,* 547 A.2d at 240 (court-ordered exam permissible when defendant intended to present psychiatric testimony that she suffered from "battered woman's syndrome"). *But see State v. Vosler,* 216 Neb. 461, 345 N.W.2d 806, 812–13 (1984).

■ This is somewhat analogous to the rule that a defendant who elects to testify at trial may not invoke the self-incrimination privilege to avoid cross-examination. *See State v. Taylor,* 99 Ariz. 85, 90–91, 407 P.2d 59, 62–63 (1965). *Accord Fitzpatrick v. United States,* 178 U.S. 304, 315, 20 S.Ct. 944, 948, 44 L.Ed. 1078, 1083 (1900). To hold otherwise would deprive the state of the only adequate means to contest the conclusions of a defense psychiatric expert. *See United States v. Byers,* 740 F.2d 1104, 1111–13 (D.C.Cir.1984) (plurality opinion) (upholding court-ordered psychiatric exam as necessary to maintain a "fair state-individual balance").

Defendant's reliance on *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), is misplaced. In *Estelle,* the U.S. Supreme Court determined that it violated defendant's privilege against self-incrimination to use against him at sentencing the testimony of a psychiatrist who performed

a pre-trial competency examination without defendant's fully-informed consent. The *Estelle* court distinguished that case from those similar to the one at bar, in which a defendant claims a diminished mental condition and offers supporting psychiatric testimony. 451 U.S. at 465, 101 S.Ct. at 1874, 68 L.Ed.2d at 370.

We therefore hold that ordering defendant to submit to a mental examination did not violate his privilege against self-incrimination. We note that this conclusion is consistent with past Arizona cases dealing with the privilege. *See State v. Mauro*, 159 Ariz. 186, 196, 766 P.2d 59, 69 (1988) (rejecting argument that it violated the privilege to allow a court-appointed psychiatrist to testify that defendant requested counsel during the exam); *State v. Freeman*, 114 Ariz. 32, 41–42, 559 P.2d 152, 161–62 (1976) (privilege against self-incrimination is not violated when psychiatrist who examined defendant for competency to stand trial testifies based on that exam that defendant was sane at the time of the offense); *State v. Karstetter*, 110 Ariz. 539, 542–43, 521 P.2d 626, 629–30 (1974) (where defendant raises insanity defense, allowing state psychiatrists to testify that defendant refused to talk with them did not violate the privilege); *see also* Rule 11.7(a), Ariz.R.Crim.P., 17 A.R.S. (making evidence obtained pursuant to Rule 11 inadmissible "at any proceeding to determine guilt or innocence unless the defendant presents evidence intended to rebut the presumption of sanity.")

### B. *Right to counsel*

■■ Defendant further argues that the trial court erred in denying his request to have counsel present during the examination. Neither *Estelle*, upon which defendant relies, nor *State v. Mauro*, 149 Ariz. 24, 716 P.2d 393 (1986), *rev'd on other grounds*, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987), cited by the state, disposes of this issue. *Estelle* held that a defendant is entitled to assistance of counsel before being subjected to a psychiatric examination. 451 U.S. at 469–71, 101 S.Ct. at 1876–77, 68 L.Ed.2d at 373–74. Citing

*Estelle*, this court held in *Mauro* that a defendant has a right to counsel in formulating an approach to the examination, but noted that whether there is a right to have counsel physically present during the examination is "an unsettled question." 149 Ariz. at 34, 716 P.2d at 403. Although arguments have been made to the contrary, *see, e.g., Byers*, 740 F.2d at 1161–73 (Bazelon, J., dissenting); *Houston v. State*, 602 P.2d 784, 792–96 (Alaska 1979), we agree with the majority of courts addressing the issue that a defendant has no such constitutional right. *See, e.g., Riles*, 799 F.2d at 954; *Byers*, 740 F.2d at 1115, 1122 (plurality opinion); *United States v. Mattson*, 469 F.2d 1234, 1236 (9th Cir.1972); *State v. Steiger*, 218 Conn. 349, 590 A.2d 408, 420 (1991); *State v. Brown*, 235 Kan. 688, 681 P.2d 1071, 1073 (1984).

■■ A defendant has the right to an attorney at a pre-trial confrontation in which "the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself." *United States v. Wade*, 388 U.S. 218, 227, 87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149, 1157 (1967). While counsel's presence during the psychiatric examination might bestow a strategic benefit, it is not required to ensure defendant's right to a fair trial. *Cf. Gilbert v. California*, 388 U.S. 263, 267, 87 S.Ct. 1951, 1953, 18 L.Ed.2d 1178, 1183 (1967) (there is no right to have an attorney during the taking of handwriting exemplars; the risk that absence of counsel would derogate from a fair trial is minimal). Moreover, counsel's presence at a psychiatric examination might actually "hinder the psychiatrist from effectively examining the defendant," *State v. Hardy*, 283 S.C. 590, 325 S.E.2d 320, 322 (1985), and therefore defeat the purpose of the exam.

■■ Rule 11.3, Ariz.R.Crim.P., 17 A.R.S., seeks to provide procedural safeguards by requiring the examiner to be both qualified and court-appointed. Further, there has been no showing that Rule

11 examinations are particularly subject to abuse. *Cf. Wade*, 388 U.S. at 228, 235–37, 87 S.Ct. at 1933, 1937, 18 L.Ed.2d at 1158, 1162–63 (supporting a right to counsel at pretrial lineups because such procedures are "peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial"). If the defense wishes to challenge the manner in which a mental examination has been conducted, or an expert's conclusions, this can be done on cross-examination or during the testimony of its own witness. *People v. Larsen*, 74 Ill.2d 348, 24 Ill.Dec. 538, 542, 385 N.E.2d 679, 683 (1979); *see also United States v. Ash*, 413 U.S. 300, 315, 93 S.Ct. 2568, 2576, 37 L.Ed.2d 619, 629 (1973) (there are times when the subsequent trial would cure a "one-sided confrontation between prosecuting authorities and the uncounseled defendant"). The trial court did not err by refusing defendant's request to have counsel present at Dr. Cleary's exam.[1]

## C. *Relevance*

■ Finally, defendant argues that the court erred in admitting Dr. Cleary's testimony at trial because it was irrelevant and not proper rebuttal. We disagree. Dr. Bendheim testified that defendant had a tendency to hold in his feelings and then explode at inopportune moments. He described this as an "impulsive personality." He testified that in his opinion the defendant did not intend to kill the victim. Rather, he said, defendant intended only to disable her so he could get away, but impulsively used excessive force.

Defense counsel moved to preclude Dr. Cleary from testifying, arguing that he would say only that defendant was legally sane at the time of his examination. This obviously was not an issue in the case. Counsel additionally advised the court that Cleary would be unable or unwilling to express an opinion about defendant's character for impulsivity. The trial judge denied the motion.

Dr. Cleary testified in part as predicted, but also said more. He admitted that because of the passage of time he could not render an opinion about defendant's mental state during the killing. He indicated that members of his profession were in significant disagreement as to how soon after an event a mental health expert should examine a person in order to fairly discern his or her mental state at the time of that event. He expressed reluctance to render his "subjective impression of another person's subjective state." He also stated that he thought defendant "attempted to control the examination by not going into areas that he did not want to discuss."

The bulk of Dr. Cleary's testimony was relevant. It raised questions about the ability of Dr. Bendheim, or any other examiner, to formulate an accurate retrospective diagnosis of defendant's mental state at the time of the crime. The court did not err in allowing Dr. Cleary to testify, and though testimony regarding defendant's sanity at the time of the examination may have been irrelevant, defendant suffered no prejudice by its admission.

## JURY MISCONDUCT

■ Defendant argues that the trial court should have granted a mistrial because of jury misconduct. A newspaper containing a report of defendant's rejected attempt to plead guilty was found in the possession of one juror. The judge questioned her and she denied having read the article or any other account of the trial. The bailiff also found newspapers in the jury room trash can, some of which contained an article about defendant.

■ When a jury has considered extrinsic evidence, the trial court must grant a

---

1. We hold only that the presence of counsel at a mental examination is not constitutionally required. We express no opinion regarding whether this court should, as we recently have done in civil cases, afford defendants that right pursuant to our rulemaking authority. *See* Supreme Court of Arizona, Order Amending Rule 35, Arizona Rules of Civil Procedure, 172 Ariz. XLI (Oct. 1, 1992) (amending Rule 35(a) to grant a person subjected to a medical examination the right to have a "representative" present unless such presence "may adversely affect" the examination).

new trial unless it finds beyond a reasonable doubt that such evidence did not affect the verdict. *State v. Chaney,* 141 Ariz. 295, 311, 686 P.2d 1265, 1281 (1984). This decision lies within the sound discretion of the court. *Id.* There has been no showing of misconduct here. The trial judge personally questioned the juror who had the newspaper and discerned that she had not read the article. There was also no evidence that other jurors had violated the court's admonition by reading about defendant or the case, nor even a defense request that they be specifically questioned in this regard. Denying defendant's new trial motion was therefore not an abuse of discretion.

## JURY INSTRUCTIONS

Defendant claims the trial court erred by failing to give proposed jury instructions regarding the admissibility of his confession.

Proposed instruction 21 would have instructed the jury that the confession should be disregarded if it "reasonably may have been the result of a mental condition." Defendant argues, citing *State v. Porter,* 122 Ariz. 453, 595 P.2d 998 (1979), that the jury should have had the opportunity to find his confession involuntary because it resulted from his mental condition, i.e., a tendency to act impulsively. The proposed instruction was properly refused because the evidence did not support it. *Porter,* 122 Ariz. at 456, 595 P.2d at 1001 (an instruction on voluntariness must be supported by substantial evidence). There was nothing to suggest that defendant acted impulsively when he confessed. By all accounts he was calm and coherent during the interrogation. Furthermore, defendant had the police called after he first related his conduct to his mother and pastor.

Proposed instruction 21 goes far beyond that approved in *Porter.* The instruction there required the jury to disregard a confession if it *"was* by reason of mental illness ... not the product of *a rational intellect and a free will,"* 122 Ariz. at 455, 595 P.2d at 1000 (emphasis added). The proposed instruction here required disregarding the confession if it *"reasonably may have been* the result of a *mental condition."* (Emphasis added). We know of no law supporting such a charge.

Proposed instruction 22 would have directed the jury not to consider the confession unless it found beyond a reasonable doubt that the confession was *both* voluntary and true. This is also an incorrect statement of the law. Once the trial judge preliminarily determines that a confession is admissible, he or she must, if requested by the defense, instruct the jury to disregard the confession unless it is found to be voluntary. *See Hart v. Eyman,* 458 F.2d 334, 338 (9th Cir.1972); *see also State v. Cobb,* 115 Ariz. 484, 488, 566 P.2d 285, 289 (1977). Defendant has cited no case, nor have we found any, holding that a jury must also find the confession true before considering it.

Proposed instruction 27, which told the jury to disregard the confession unless it found it voluntary, did not differ in substance from the instruction given. "[A] trial court is not required to give a proposed instruction when it is adequately covered by other instructions." *State v. Wiley,* 144 Ariz. 525, 540, 698 P.2d 1244, 1259 (1985), *overruled on other grounds by State v. Superior Court,* 157 Ariz. 541, 544, 760 P.2d 541, 544 (1988). Thus, the trial court did not err by refusing it.

## DISPOSITION

We have searched the record for fundamental error and found none. The judgment of conviction on all charges, and the sentences for kidnapping and sexual assault are affirmed. Defendant's death sentence is vacated and the cause is remanded for a new sentencing hearing.

MOELLER, V.C.J., and CORCORAN, MARTONE and FERNANDEZ,[2] JJ., concur.