IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, ex rel.
ALLISTER ADEL, Maricopa County Attorney, *Petitioner*,

*v.*

THE HONORABLE JOHN R. HANNAH, Judge of the SUPERIOR
COURT OF THE STATE OF ARIZONA, in and for the County of
MARICOPA, *Respondent Judge,*

KIPLING DAVID HARRIS,
*Real Party in Interest.*

No. 1 CA-SA 20-0152
FILED 12-31-2020

Petition for Special Action from the Superior Court in Maricopa County
No. CR2016-132194-001
The Honorable John R. Hannah, Jr., Judge

**JURISDICTION ACCEPTED; RELIEF GRANTED; REMANDED**

COUNSEL

Maricopa County Attorney's Office, Phoenix
By Julie A. Done, Kristin Larish
*Counsel for Petitioner*

Maricopa County Public Defender's Office, Phoenix
By Alicia Dominguez, Nikolas Forner
*Counsel for Real Party in Interest*

## OPINION

Judge David B. Gass delivered the opinion of the Court, in which Presiding Judge Jennifer M. Perkins and Judge Michael J. Brown joined.

**G A S S**, Judge:

¶1        Along with lesser charges, the State charged Kipling David Harris with two counts of first-degree murder and noticed its intent to seek the death penalty for each. Though the case has not gone to trial, Harris has put the State on notice that he will offer evidence of his mental health in a potential penalty phase.

¶2        At issue here is whether the superior court abused its discretion when it limited the scope of the State's psychological evaluation of Harris. Because the superior court did, we accept special action jurisdiction and grant relief. We vacate the superior court's orders and remand for further proceedings.

## FACTUAL AND PROCEDURAL HISTORY

¶3        Harris put the State on notice he intends to offer mitigation evidence from two psychologists—Drs. James Sullivan and Jolie Brams—during the penalty phase if he is convicted of either of the first-degree murder charges. Sullivan and Brams authored summaries of their independent evaluations of Harris (discussed more fully below), but they did not write comprehensive reports. In response, the State sought to have Dr. James Seward evaluate Harris.

¶4        Harris moved to limit the scope of Seward's evaluation. The State opposed Harris's motion, arguing, among other things, Harris opened the door to a full evaluation by putting his mental health at issue and the State was entitled to develop evidence rebutting his mitigation evidence. After briefing and oral argument, the superior court granted Harris's motion, limiting Seward's evaluation of Harris as follows:

1. "[T]he State is not permitted to conduct a general exploration of Mr. Harris' psychology in an effort to reach a diagnosis as though from scratch, because that is a lot broader than what the defense is intending to present."

2. Seward's "evaluation may not discuss the circumstances of the offense, the facts of the offense, and the events immediately surrounding the offense." Instead, "Seward may address in his interview Mr. Harris' life circumstances (to explain his developmental trajectory) and his personal history (including his experience and performance on probation.)"

3. Regarding psychological testing:

   a. "Seward may administer one broad based personality test, either the MMPI or the Personality Assessment Inventory (PAI), [but] is prohibited from administering the PCL-R or Hare Psychopathy Checklist."

   b. "[P]rior to the evaluation of Mr. Harris, the State shall present the Defense with a good faith list of specific test(s) that Dr. Seward intends to administer. Alternatively, Dr. Seward may proceed with an evaluation and testing that mirrors the defense testing."

¶5 The State petitioned for special action review of the superior court's orders.

## SPECIAL ACTION JURISDICTION

¶6 Though this court lacks jurisdiction over direct appeals from death sentences, it may "hear and determine petitions for special actions brought pursuant to the rules of procedure for special actions." *See* A.R.S. § 12-120.21.A.4. "This grant to the Court of Appeals of broad jurisdiction over special actions necessarily includes special actions arising out of capital cases." *State v. Arellano*, 213 Ariz. 474, 476, ¶ 4 (2006).

¶7 "Special action jurisdiction is highly discretionary but may be appropriate when no equally plain, speedy, and adequate remedy by appeal exists. Jurisdiction is also appropriate in matters of statewide importance, issues of first impression, cases involving purely legal questions, or issues that are likely to arise again." *Prosise v. Kottke*, 249 Ariz. 75, 77, ¶ 10 (App. 2020) (quotations omitted).

¶8 This court generally will decline special action jurisdiction over discovery disputes. *See Yuma Reg'l Med. Ctr. v. Superior Court*, 175 Ariz. 72, 74 (App. 1993). Here, however, the State has no adequate, alternative remedy if it is denied the opportunity to independently develop evidence to rebut Harris's proffered mitigation. This case also raises questions of

statewide importance concerning the appropriate scope of the State's discovery when a defendant's mental health will be at issue in a potential penalty phase in a capital case. We, therefore, exercise our discretion and accept special action jurisdiction.

**ANALYSIS**

**¶9**　　　　When Harris put his mental health at issue as a mitigating factor, he waived his Fifth Amendment right against self-incrimination in a potential penalty phase. *See State v. Rushing*, 243 Ariz. 212, 224, ¶ 54 (2017). The waiver, however, does not mean the State has a right to use Harris's statements against him before the penalty phase. *See Phillips v. Araneta*, 208 Ariz. 280, 284, ¶ 14 (2004). Indeed, the State may not use, or admit into evidence, statements Harris may make during Seward's examination, any testimony from Seward based on those statements, or any "other fruits of [Harris's] statements . . . *except* on those issues on which [Harris] introduces expert testimony during the penalty phase." *See id.* (emphasis added).

**¶10**　　　　Consistent with *Phillips*, whether evidence from Seward's evaluation of Harris will be admissible is a matter for another day. *See id.* The issue for today is scope of discovery, not Harris's Fifth Amendment rights or the protection of those rights. Specifically, the issue here is the extent to which the superior court may limit the State's ability to develop evidence—through psychological testing and interviews—to rebut Harris's mitigation evidence.

**¶11**　　　　The State is entitled to "a meaningful opportunity to rebut the defendant's expert testimony." *Id.* at 283, ¶ 9; *see also State v. Cota*, 229 Ariz. 136, 146, ¶ 37 (2012) ("The State's examination need not mirror that of the defense."). Though no Arizona case has addressed the precise issue before us, *Phillips* is instructive. In *Phillips*, the supreme court recognized the need "to maintain a fair state-individual balance." 208 Ariz. at 283, ¶ 9 (quotation omitted). Accordingly, when a defendant makes mental health an issue for a penalty phase, the superior court cannot "deprive the State of the only adequate means to contest the conclusions of a defense psychiatric expert." *Id.* at ¶ 8 (quoting *State v. Schackart*, 175 Ariz. 494, 500 (1993)).

**¶12**　　　　"Under the American Psychological Association's Code of Ethics, 'psychologists provide opinions of the psychological characteristics of individuals only after they have conducted an examination of the individuals adequate to support their statements or conclusions.'" *Id.* at 285, ¶ 18 (quoting Ethical Standard 9.01(b) of the Ethical Principles of Psychologists and Code of Conduct (2002)). As a result, and as shown in the

hearing before the superior court, the State's expert must be allowed to conduct the scope of examination, including testing, he believes ethically necessary to provide adequate support for his opinions. *Id.* If the superior court's limitations constrain an expert's ethical and professional duties, the expert is unlikely to consent to offer a professional opinion. *See id.*

¶13        Within this framework, we examine the orders in this case.

**I.        The State's expert may conduct a general exploration of Harris's psychology—even making a diagnosis—to the extent the expert deems it ethically necessary to provide adequate support for his opinions.**

¶14        Harris's experts engaged in the examination and testing they felt necessary under the circumstances, though so far Harris has given only limited insight into their reasoning and conclusions. Sullivan alone conducted the following seventeen tests:

- Halstead-Reitan Neuropsychological Battery (selected subtests);
- Perceptual, Motor & Linguistic Screening;
- Wechsler Adult Intelligence Scale-IV;
- Wide Range Achievement Test (reading subtest);
- Judgment of Line Orientation;
- Wechsler Memory Scale-IV (selected subtests);
- Rey Osterreith Complex Figure Test;
- Wisconsin Card Sorting Test;
- Behavior Rating Inventory of Executive Function-Adult Version;
- Delis Kaplan Executive Function Systems (selected subtests);
- Understanding and Appreciation of *Miranda* Rights;
- Gudjonsson Suggestibility Scales;
- The MacArthur Competence Assessment;
- Tool-Criminal Adjudication;
- Inventory of Legal Knowledge;
- Test of Memory Malingering; and
- Dot Counting Test.

¶15        Harris asserts "Sullivan did not conduct a forensic interview." But the "status report" Sullivan produced says he "conducted a forensic neuropsychological evaluation" of Harris at defense counsel's request.

¶16       Harris has not disclosed any detail about the extent of Brams's evaluation or identified the tests she conducted. Instead, Harris disclosed a letter from Brams stating, in part:

> The scope of my testimony is not to provide an excuse for the offense behaviors, but to opine on the defendant's reduced culpability, related to marked deficits in attachment, interpersonal relationships, problem solving, and impulse control, all primarily related to extremely destructive early and later developmental experiences that thwarted his emotional growth.

¶17       And Harris's list of mitigating factors is extensive—26 in all. One is a statutory mitigating factor, and 25 are non-statutory. They are:

- Ability to appreciate the wrongfulness of his conduct was significantly impaired (statutory factor);
- Premature Birth /Insecure Attachment;
- Brain Damage / Traumatic Brain Injury;
- Low Average I.Q.;
- Impaired Executive Function;
- High Suggestibility;
- Hyper-masculinity;
- Dysfunctional Family Background;
- Family History of Domestic Violence;
- Verbal and Physical Abuse by Father;
- Parental Overprotectiveness;
- Inconsistent Parental Stability;
- Death of Mother;
- Exposure to Parental Substance Abuse;
- Self-Loathing / Self-Blame;
- Lack of Social Skills / Deficits in Interpersonal Relationships;
- Need for Family and Belonging;
- Good Conduct during Trial;
- Good Behavior during Pretrial Incarceration;
- Ability to Adapt to a Prison Environment;
- Remorse;
- Residual Doubt;
- Parental Abandonment;
- Deficits in Problem Solving;
- Impulse Control Deficits; and

- Cumulative Effect of Mitigation.

¶18 Harris now asserts he "has withdrawn the statutory mitigator" regarding his alleged inability to appreciate the wrongfulness of his conduct. But, as the State rightly notes, the record does not support this assertion. Stated simply, Harris claims Sullivan and Brams will provide broad and numerous items supporting mitigation, should they be called on to do so. That context—broad potential and as yet undisclosed mitigation evidence—makes particularly stark the orders restricting the State's discovery by its expert.

¶19 Defendants who seek to narrow the State's discovery regarding their mental health bear a heavy burden. *See, e.g.*, *Cota*, 229 Ariz. at 146, ¶¶ 36–37; *Phillips*, 208 Ariz. at 281–84, ¶¶ 4–14. Harris has not met this burden. He identifies no prejudice or material inconvenience to him if Seward can perform the evaluation Seward determines to be ethically necessary to support his opinions. Harris will receive a copy of Seward's report and the evaluation results. If the case proceeds to the penalty phase, Harris will be able to challenge the admissibility of this evidence. And until then—during the guilt phase—the State is prohibited from inappropriately using any evidence Seward develops. *See Phillips*, 208 Ariz. at 284, ¶ 14.

¶20 The order barring Seward from conducting a general exploration of Harris's psychology denies the State a "meaningful opportunity to rebut [Harris's] expert testimony." *See id.* at 283, ¶ 9. Given Harris's wide-ranging list of mitigating factors, the extensive testing done by his experts, and his vague disclosures, Seward must be allowed to conduct his work "from scratch" to identify and explore his understanding of Sullivan's and Brams's theories while also developing his own alternative theories. As Seward explained in a letter supporting the State's opposition to Harris's motion, he does not know exactly what Sullivan and Brams addressed with Harris during their evaluations and testing. And he does not know the full scope of Sullivan's and Brams's opinions.

¶21 Even if Harris's experts did not conduct forensic neuropsychological evaluations, Seward may perform such an evaluation if he concludes it is ethically necessary to provide adequate support for his opinions. Such flexibility is crucial if Seward's expertise is to guide his analysis. Just because Seward may pursue a broader line of investigation than the defense experts does not mean it is inappropriate. *See id.* at 284, ¶ 12 (additional post-examination testing and investigation "may be crucial to an expert's ability to accurately assess and diagnose a defendant's mental health"). This order effectively precludes Seward from developing his own

theories to rebut Harris's evidence by limiting Seward to double-checking Sullivan's and Brams's work.

¶22        In short, when Harris put his mental health at issue, he opened the door to the State examining his general mental-health history and condition. *See id.* at 283, ¶ 8. This order cannot stand because it blocks Seward's ability to meet his ethical and professional obligations when forming an opinion of Harris's psychological state. *See id.*

**II.     The State's expert may question Harris about the circumstances, facts, and events immediately surrounding the crimes if the expert deems it ethically necessary to provide adequate support for his opinions.**

¶23        Harris and the State dispute the extent to which Harris discussed the crimes with Sullivan and Brams and how those discussions arose. Regardless, those discussions occurred. And Sullivan and Brams both documented the discussions in their summaries, suggesting they may be relevant. The State must be allowed a fair opportunity to discover the same information. *See Rushing*, 243 Ariz. at 224–25, ¶ 54; *see also Phillips*, 208 Ariz. at 283, ¶ 9; *Schackart*, 175 Ariz. at 500.

¶24        As in *Rushing*, Harris's mitigating factors relate to the circumstances of the offense. *See* 243 Ariz. at 224–25, ¶ 54. It, therefore, would be unfair to prohibit the State's expert from discussing the offenses with Harris. *See id.* Moreover, discovery of evidence pretrial is a broader concept than admissibility of evidence at trial. *See State v. Fields*, 196 Ariz. 580, 582, ¶ 4 (App. 1999) (information is discoverable if "it could lead to admissible evidence or would be admissible itself"). Though some information Harris discloses to Seward ultimately may be inadmissible, the State is entitled to discover it based on Harris's alleged mitigating factors. *See id.*

**III.    The State's expert may administer the tests the expert deems ethically necessary to provide adequate support for his opinions, which may include new tests and re-administering tests done by Harris's experts.**

¶25        Harris's experts each presumably conducted the tests they determined necessary to comply with their ethical and professional duties. But the order challenged here does not give the State the same opportunity. Under this order, if Seward wants to perform a broad-based personality test, he must choose either the MMPI or the PAI. Under no circumstances may he use an alternative test, such as the PCL-R or the Hare Psychopathy

Checklist, even if—in his professional opinion—a different test is more appropriate. By dictating the specific tests Seward may perform, the superior court inappropriately substituted its judgment for Seward's. *Cf. State v. Conner*, 249 Ariz. 121, 126, ¶ 26 (App. 2020) ("Although serving as a gatekeeper, the trial court does not replace the adversarial system.").

¶26          Instead of allowing Seward to exercise his professional judgment as he evaluates Harris, this order requires Seward to choose either Option A (use the same tests Harris's experts used) or Option B (provide in advance a best-guess list of the specific tests he might administer—subject to defense objection and court approval). What the superior court did is analogous to telling a surgeon to decide in advance whether to use Procedure A or Procedure B and barring the surgeon from deviating from the chosen course regardless of new circumstances that may arise during the surgery or the potential impact on the patient. Few—if any—surgeons or patients would accept such a proposal, let alone have a court specify what options the surgeon will consider.

¶27          Here, the superior court imposed such unacceptable limitations on Seward. *See Phillips*, 208 Ariz. at 285, ¶ 18. As Seward explained, he cannot determine in advance what tests he will need to perform to comply with his ethical and professional duties. Seward, like any psychologist, must make those decisions based on his professional judgment as he proceeds. And Harris has not explained why the numerous tests his experts performed were necessary but other tests Seward may want to perform are not.

¶28          The type and extent of testing an expert performs while forming an opinion generally is an issue for the expert, not a judge. If otherwise qualified experts, providing otherwise admissible evidence, disagree on the extent or nature of required testing, they should explain their reasoning to the jury, not the court. *Cf. State v. Bernstein*, 237 Ariz. 226, 230, ¶ 18 (2015) ("In close cases, the trial court should allow the jury to exercise its fact-finding function, for it is the jury's exclusive province to assess the weight and credibility of evidence."). Indeed, Seward's credibility could be subject to devastating cross-examination if he were compelled to admit that, in his professional opinion, his work was incomplete or inadequate because of the order's limitations. *See Phillips*, 208 Ariz. at 285, ¶ 18.

## CONCLUSION

¶29     This court accepts jurisdiction, grants relief by vacating the superior court's orders, and remands to the superior court for further proceedings consistent with this opinion.



AMY M. WOOD • Clerk of the Court
FILED:          JT