2 P.3d 670

**The STATE of Arizona, Petitioner,**

v.

**Hon. Richard FIELDS, Judge of the Superior Court of the State of Arizona, in and for the County of Pima, Respondent.**

**and**

**John Eric Rosengren, Andrew Anthony Carrera, and Marissa Ann Rodriguez, Real Parties in Interest.**

**No. 2 CA–SA 99–0093.**

Court of Appeals of Arizona, Division 2, Department B.

Oct. 18, 1999.

Review Denied May 23, 2000.

Barbara LaWall, Pima County Attorney By Elizabeth Tyszko, Tucson, Attorneys for Petitioner.

Michael J. Bloom, Tucson, Attorney for Real Parties in Interest.

## OPINION

ESPINOSA, Chief Judge.

¶ 1 The State of Arizona seeks relief from the respondent trial judge's order in the underlying criminal proceedings against real parties in interest John Eric Rosengren, Andrew Anthony Carrera, and Marissa Ann Rodriguez (the defendants) granting their consolidated requests for a physical inspection of the Tucson City/County Crime Laboratory (Crime Lab) for purposes of observing and videotaping the personnel, equipment, and procedures used in analyzing blood for the presence of intoxicants. Because we conclude that the respondent judge abused his discretion and exceeded his authority in entering the order and because the state has no equally plain, speedy, or adequate remedy by appeal, we accept jurisdiction and grant relief. Ariz. R.P. Special Actions 1 and 3, 17B A.R.S.; *State v. O'Neil,* 172 Ariz. 180, 836 P.2d 393 (App.1991); *State v. Superior Court,* 132 Ariz. 374, 645 P.2d 1288 (App. 1982).

### Facts and Procedural History

¶ 2 The defendants have each been charged with homicide, committed while driving under the influence of intoxicating substances.[1] Samples of their blood were obtained after their accidents and were analyzed at the Crime Lab by gas chromatography. In that method, according to the record before us, a blood sample and certain chemicals are mixed in a vial, creating an "aliquot." The aliquot is heated, causing portions of the solution to become gaseous and move into the "head space" of the vial. The gas chromatograph extracts part of the gas and sends it through a specially coated "column," which separates the gaseous substances based on their weight. At the end of the column, a flame ignites the separated gases, causing an electrical charge that the chromatograph measures. An attached computer generates a graph of the measure-

---

1. The documents submitted to this court do not contain a copy of Carrera's indictment, but we accept the averments of counsel as to the charges against him.

ments, and the areas of unknown samples are compared to known calibrators and controls. The resulting ratios reveal concentrations of substances in the blood.

¶3 The Crime Lab's tests in these cases showed Rodriguez and Rosengren had blood alcohol concentrations (BACs) above the legal limit and revealed cocaine and trace amounts of alcohol in Carrera's blood. The defendants filed separate motions pursuant to Rule 15.1(e), Ariz. R.Crim. P., 16A A.R.S., requesting access to the Crime Lab to conduct an "independent audit or evaluation" of its methodology, equipment, and operations on grounds that the state Department of Health Services (DHS) had failed "to carry out its statutorily mandated function of regulating" forensic labs and that the Crime Lab had failed "to follow scientifically acceptable procedures in connection with blood analyses." After consolidating the motions, the respondent judge granted the defendants' requests to inspect and videotape the Crime Lab for "no more than two (2) full working days," finding "extremely unusual and limited circumstances present herein where the defense has obviously discovered cause to question the lab's mode of operation pertaining to blood analysis in the recent past." The judge then granted the state's request to stay the trials while the state petitioned for special action relief; we have extended the stay on the state's motion.

## Discussion

¶4 A trial court has broad discretion over discovery matters, and we will not disturb its rulings on those matters absent an abuse of that discretion. *State v. Tankersley*, 191 Ariz. 359, 956 P.2d 486 (1998). Although a trial court is in the best position to rule on discovery requests, *id.*, it "abuses its discretion when it misapplies the law or predicates its decision upon irrational bases." *Blazek v. Superior Court*, 177 Ariz. 535, 537, 869 P.2d 509, 511 (App.1994). To warrant an order for disclosure under Rule 15.1(e), Ariz. R.Crim. P., a defendant must demonstrate that he or she has a "substantial need" for the requested information and "is unable without undue hardship to obtain the substantial equivalent by other means." Infor-

mation is not discoverable unless it could lead to admissible evidence or would be admissible itself. See *State v. Cano*, 154 Ariz. 447, 743 P.2d 956 (App.1987).

¶5 The state argues that the respondent judge abused his discretion in granting the defendants' motions, contending the discovery order is unprecedented, not permitted by the rules of criminal procedure, unsupported by any showing of need, violates the doctrine of separation of powers in attempting to address regulatory concerns, and fails to address a justiciable issue. Moreover, the state argues, the defendants' blood tests were performed accurately and in compliance with the applicable law, A.R.S. § 28–1326. The state further asserts that denying the defendants access to the Crime Lab will not violate any of their rights and will be in the public's best interest by avoiding significant disruption to the functioning of the Crime Lab. Finally, the state argues, the respondent judge's order opens the door to a flood of similar defense requests to access and occupy the Crime Lab any time forensic evidence is involved in a criminal prosecution.

¶6 In response, the defendants claim the order "finds overwhelming support in the unusual circumstances of this case," reurging grounds from their motions that DHS conducts no statewide quality assurance program for blood alcohol testing, does not inspect crime laboratories, and relies solely on proficiency testing to evaluate laboratory analysts. The defendants further allege that the Crime Lab used single aliquot testing until November 1, 1998, when it adopted the industry standard of double aliquot testing; backdated to November 1, 1998, a January 1999 memorandum to DHS, which stated it had switched to double aliquot testing; used the gas chromatograph in October 1998 when it was not functioning properly; misused pipettes when filling the vials; used test tubes after their expiration dates had passed; and operated the gas chromatograph with improperly high flow rates of chemicals in October 1998.

¶7 The state disputes most of these allegations and their relevancy, for example, pointing out that none of the tests at issue was performed while the gas chromatograph was

broken nor before the Crime Lab switched to double aliquot testing.[2] Even assuming the allegations are true, however, nothing in the record before us establishes the defendants' "substantial need" to observe and record the Crime Lab's current operations. Curiously lacking from the defendants' motions and their response to the state's petition are any assertions 1) that their respective BAC determinations were incorrect or inaccurate; 2) how, or even if, the alleged lab deficiencies affected their test results; or 3) any indication as to what admissible evidence they expect to find in observing the Crime Lab's operations. See *State v. Superior* Court, 107 Ariz. 332, 487 P.2d 399 (1971) (trial court abused discretion in granting DUI defendant's motion to produce breathalyzer ampoule when defendant failed to show how post-test chemical composition of ampoule could have made valid contribution to defense); see also *State v. Hatton*, 116 Ariz. 142, 568 P.2d 1040 (1977) (mere conjecture that undisclosed police reports about other disturbances in crime scene area might reveal other suspects insufficient to require disclosure); *Bettlyoun v. State*, 562 P.2d 862, 866 (Okla.Crim.App.1977) (defendant must demonstrate need based on materiality and facts, not conclusions, surmise, and conjecture; "blanket request will not be granted, merely in hope that something will turn up").

¶ 8 We have reviewed the numerous exhibits the defendants have submitted, including testimony from an expert defense witness in an unrelated case, which alleged that some of the Crime Lab's past procedures were deficient. Nothing in the expert's testimony, however, nor anything else in the defendants' materials, explains how inspecting the Crime Lab and videotaping its personnel and procedures now would be relevant to these proceedings or would produce additional information for which the defendants have a substantial need to prepare their cases and that cannot be obtained by other means. See *Tankersley*, 191 Ariz. at 367, 956 P.2d at 494 (defendant's motion to compel discovery of DNA typing strip photos and amplification sheets from other tests in same laboratory to

"evaluate possible contamination in [the] lab" properly denied as irrelevant and burdensome); cf. *State v. Dumaine*, 162 Ariz. 392, 783 P.2d 1184 (1989) (undisclosed evidence must be material to invoke state's duty to disclose). Indeed, the sole support for the requests appears to be merely assertions of counsel, before the respondent judge and this court, such as, "it is necessary for the Defendants' expert to be able to actually view the setting in which the analys[e]s are conducted, and the procedures actually employed," and "there's only so much we can find out through an interview."

¶ 9 The state points out that the defendants can obtain detailed information about the performance of the tests on their individual blood samples and the relevant testing protocols that were actually used at the time of the defendants' tests through the regular process of witness interviews and disclosure of documents, much of which appears to have already occurred. The defendants have provided no evidence, expert or otherwise, that inspecting and videotaping will be more productive than interviews and documents in analyzing and critiquing the Crime Lab's methods. Cf. *State v. Mauro*, 159 Ariz. 186, 766 P.2d 59 (1988) (jury could get necessary evidence from testimony, diagrams, and photographs as opposed to viewing crime scene); *State v. Prewitt*, 104 Ariz. 326, 452 P.2d 500 (1969) (when view of premises immaterial to defense, defendant's request properly denied). Moreover, none of the defendants has challenged the accuracy of the Crime Lab's test results through independent testing of the blood samples each was apparently offered or provided, although this would be the best evidence of the only material issue, the accuracy of the reported BACs. Contrary to the respondent judge's conclusion, in the absence of any showing of need or any actual dispute as to the correctness of the test results, the defendants' motion to inspect the Crime Lab can only be viewed as an attempted "fishing expedition," which the rules do not permit. See *Hatton; State v. Kevil*, 111 Ariz. 240, 527 P.2d 285 (1974).

---

**2.** Rodriguez's test was performed on December 10, 1998; Rosengren's on February 28, 1999; and Carrera's on May 4, 1999.

¶ 10 Accordingly, we conclude the respondent judge abused his discretion in granting the defendants' discovery requests. We thus vacate the judge's order of August 9, 1999, permitting observation and videotaping of the Crime Lab's personnel and operating procedures.

CONCURRING: J. WILLIAM BRAMMER, JR., Presiding Judge, and JOSEPH W. HOWARD, Judge.