IN THE COURT OF APPEALS
STATE OF ARIZONA
DIVISION TWO

| | | |
|---|---|---|
| THE STATE OF ARIZONA, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | 2 CA-SA 2009-0062 |
| HON. DEBORAH BERNINI, Judge of | ) | DEPARTMENT A |
| the Superior Court of the State of | ) | |
| Arizona, in and for the County of Pima, | ) | O P I N I O N |
| | ) | |
| Respondent, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ERICA LEA DAUGHTERS-WHITE; | ) | |
| SEAN AARON JOHNSON; JOHN | ) | |
| CLIFTON LIVINGSTON; HILDA | ) | |
| ALDAY; JONI MARI LUJAN; JUAN | ) | |
| CARLOS RODRIGUEZ; CRISTAL | ) | |
| MIKESELL; JAMES FREEMAN; | ) | |
| MARTIN LEE HULETT, JR.; JOHNNIE | ) | |
| WILLIE TREADWAY; ARLENE | ) | |
| KANDIS TONEY; ROMEO ALONSO | ) | |
| RODRIGUEZ; RICKY JOSEPH | ) | |
| WILLIAMS; BELINDA MARIE | ) | |
| SANCHEZ; JARED SHERER; STEVEN | ) | |
| ANTHONY BONIN; RYAN A. | ) | |
| BRAYFIELD; KASEY LACH; DANIEL | ) | |
| OLIVERI; TERRY CRUMRINE; | ) | |
| DENNIS BARRERAS, JR.; MARTIN | ) | |
| SANDERS; MORAIMA SELIG; | ) | |
| ERNEST ROMERO; JORGE | ) | |
| GONZALEZ; RAQUEL CORONADO; | ) | |
| KELLY SCHRECK; and SEAN | ) | |
| O'SHEA, | ) | |
| | ) | |
| Real Parties in Interest. | ) | |
| | ) | |

SPECIAL ACTION PROCEEDING

Pima County Cause Nos. CR-20071798, CR-20072680, CR-20070902, CR-20071499,
CR-20073079, CR-20073256, CR-20073391, CR-20073480, CR-20073727,
CR-20073946, CR-20074048, CR-20074156, CR-20074805, CR-20080057,
CR-20080301, CR-20080687, CR-20080876, CR-20081388, CR-20082259,
CR-20082120, CR-20082990, CR-20083187, CR-20083394, CR-20083626,
CR-20083996, CR-20091579, CR-20092032, CR-20092143, CR-20074485
(Consolidated)

JURISDICTION ACCEPTED; RELIEF GRANTED

Barbara LaWall, Pima County Attorney
  By Jacob R. Lines                                              Tucson
                                              Attorneys for Petitioner

Nesci, St. Louis & West PLLC
  By James Nesci and Joseph St. Louis                            Tucson
                                    Attorneys for Real Parties in Interest

E S P I N O S A, Presiding Judge.

¶1        The State of Arizona has petitioned this court for special action relief from the respondent judge's order that it produce software for the Intoxilyzer 8000, the breath-testing equipment currently used by the Tucson Police Department, to real parties in interest, Erica Daughters-White and twenty-seven other defendants (Defendants) charged in these consolidated cases with driving with a blood alcohol concentration of .08 or more. In *State v. Bernini*, 220 Ariz. 536, ¶¶ 8, 11, 207 P.3d 789, 791-92 (App. 2009), we vacated the respondent judge's order that the state obtain and produce "'the source code for the Intoxilyzer 8000 and Intoxilyzer 8000 software versions 8105.44, 8105.45 and 8105.46,'"

2

because we agreed with the state that the record before us did not support her finding that the state had greater access than Defendants to the software configuration or "source code."

¶2        In that opinion, we found it unnecessary to reach the state's alternative argument that Defendants had failed to establish a "substantial need" for the source code in preparing their defenses, *see* Ariz. R. Crim. P. 15.1(g), particularly as we have construed that requirement in *State v. Fields*, 196 Ariz. 580, 2 P.3d 670 (App. 1999). *See id*. ¶ 10. After we remanded this matter, the respondent found our opinion did not affect her order that the state disclose electronic versions of the actual software, but only the source codes for the software, and ordered the software disclosed.

¶3        In this petition for special action, the state seeks relief from the respondent judge's order. It maintains our decision vacated the respondent's order in its entirety and constitutes law of the case. According to the state, the respondent therefore erroneously concluded her order to disclose software had "not been set aside, reversed or reconsidered." Alternatively, the state argues Defendants failed to establish a substantial need for either the software or the associated source code. We accept jurisdiction because the state has no equally plain, speedy, or adequate remedy by appeal, *see State v. Campoy*, 220 Ariz. 539, ¶ 2, 207 P.3d 792, 795 (App. 2009), and because the issue is one of statewide importance, *see Martin v. Reinstein*, 195 Ariz. 293, ¶ 10, 987 P.2d 779, 786-87 (App. 1999).

**Whether the Respondent's Subsequent Order was Precluded**

¶4        In *State v. Bernini*, 220 Ariz. 536, ¶ 11, 207 P.3d 789, 792 (App. 2009) (*Daughters-White I*), we vacated the respondent judge's order of October 27, 2008, "'that the

3

state obtain the source code for the Intoxilyzer 8000 and Intoxilyzer 8000 software versions 8105.44, 8105.45 and 8105.46.'" In her subsequent order of July 31, 2009, at issue in this special action, the respondent wrote:

> The original hearings before this Court addressed whether Rule 15.1, Arizona Rules [of] Criminal Procedure, required the State to produce a copy of the Intoxylizer 8000 source code and software. The Court found that the State did not possess the source code and had no control over CMI [the corporation that manufactures the Intoxilyzer 8000]. However, the Court went on to find that, first, the State had better access to the source code and remained obligated to produce it under the rules and, second, that it did have possession of the software and ordered production. The Court of Appeals found no evidence to support the trial court's finding that the State had better access to the source code and reversed that ruling, but the opinion did not address the trial court's order that the software be disclosed. . . . However, despite this Court's order on September 10, 2008 that the Intoxilyzer software, versions 8105.44, 8105.45, and 8105.46, be disclosed—an order that has not been set aside, reversed or reconsidered—no disclosure has been forthcoming. The State is obligated to disclose copies of the software immediately, along with whatever may be necessary for the defense to operate or view the contents of that software.

Accordingly, the respondent ordered: "The Consolidated Defendants' Request for Production is DENIED as to the source code but GRANTED as to the software as previously ordered by the court."

¶5 First, we note the inherent ambiguity in the subject of the respondent's orders of September 10, 2008 and October 27, 2008. Both referred to "the source code for the Intoxilyzer 8000 and Intoxilyzer 8000 software versions 8105.44, 8105.45 and 8105.46," which could mean the source code for the Intoxilyzer 8000 and for the identified software

4

versions, or, as the respondent now seems to suggest, the source code for the Intoxilyzer 8000 and, separately, the software used with the Intoxilyzer 8000, specifically software versions 8105.44, 8105.45, and 8105.46.

¶6        But whatever the intended meaning of the respondent's order of October 27, 2008, we agree with the state that it was vacated by our decision in *Daughters-White I* and had no continuing vitality. Contrary to respondent's recent ruling, the October 27 order was the only decision presented to this court in *Daughters-White I* that required disclosure by the state. Specifically, after review of the respondent's minute entry orders and relevant transcripts, we find no evidence in this record that she had ever found the state possessed the software or had ordered the state to disclose it. In the minute entry of September 10, 2008, on which the respondent relied, she had ordered CMI to "produce the source code for the Intoxilyzer 8000 and Intoxilyzer 8000 software versions 8105.44, 8105.45 and 8105.46." She did not order the state in that minute entry to disclose Intoxilyzer 8000 software, as she has recently suggested, but rather expressly "decline[d] to find that the state has a Rule 15.1 obligation to produce the programming language or software utilized by CMI in its Intoxilyzer 8000 machines." Finally, we note the respondent is mistaken that her September 10, 2008 minute entry has continuing validity. The respondent herself expressly vacated the minute entry order in January 2009. Accordingly, the state had no disclosure obligations under the respondent's previous orders.

¶7        Defendants did not meaningfully respond to the state's preclusion argument in their answering brief or at oral argument before this court. It is arguable, however, that

5

the respondent intended to direct the state to produce Intoxilyzer 8000 software without relying on a previously vacated order. We therefore address the state's argument that the respondent abused her discretion in finding Defendants had met their burden of showing substantial need.

**Whether Defendants Established "Substantial Need" for Intoxilyzer 8000 Software under Rule 15.1(g).**

¶8        Although the sufficiency of a showing of substantial need may vary from case to case, a court's application of the relevant standard is a legal issue, and questions of law are appropriately reviewed by special action. *See Campoy*, 220 Ariz. 539, ¶ 2, 207 P.3d at 795 (accepting special action jurisdiction where "issues raised . . . involve questions of law relating to the interpretation and application of procedural rules" and are of statewide importance). And, "[a]lthough a trial court is in the best position to rule on discovery requests, it 'abuses its discretion when it misapplies the law or predicates its decision upon irrational bases.'" *Fields*, 196 Ariz. 580, ¶ 4, 2 P.3d at 672, *quoting Blazek v. Superior Court*, 177 Ariz. 535, 537, 869 P.2d 509, 511 (App. 1994) (internal citation omitted).

¶9        In *Fields*, we concluded the respondent judge had abused his discretion in granting defendants' requests to physically inspect, observe, and videotape the "personnel, equipment, and procedures used" by a crime laboratory in conducting blood alcohol testing. *Id.* ¶ 1. Specifically, even taking the defendants' allegations as true, we found they had failed to establish a "substantial need" for the inspection when they had not alleged "1) that their respective [blood alcohol] determinations were incorrect or inaccurate; 2) how, or even if, the alleged lab[oratory] deficiencies affected their test results; or 3) any indication as to what

6

admissible evidence they expect[ed] to find in observing the Crime Lab's operations." *Id.* ¶ 7 (collecting authorities); *cf. State v. Conner*, 215 Ariz. 553, ¶¶ 18-25, 161 P.3d 596, 603-05 (App. 2007) (no substantial need for medical records to show victim's psychological propensity for violence when, among other reasons, majority of any evidence obtained would be inadmissible). We reach a similar conclusion here.

¶10 Defendants argue they have shown "that the software is to blame for the anomalies, errors and faults that have plagued the Intoxilyzer 8000." But, as in *Fields*, even if Defendants are correct, none of the anomalies alleged has been shown to impair the reliability of the tests, and the record establishes that most are "labeling errors" that do not affect the accuracy of the alcohol-content values reported. *Cf. Mack v. Cruikshank*, 196 Ariz. 541, ¶ 12, 2 P.3d 100, 104 (App. 1999) ("due process requires that the state ensure that the tests it demands . . . produce reasonably accurate results"). And none of the Defendants has alleged his or her individual test results were inaccurate as the result of the software "bugs" identified.

¶11 For example, Defendants' expert witnesses testified about two specific circumstances in which results of tests performed with the Intoxilyzer 8000 were found to be mislabeled. They found some test results exactly .020 apart that were mislabeled as having "no .020 agreement," as well as calibration checks that were incorrectly labeled as being within tolerance or out of tolerance for allowed variation. Neither of these circumstances affected any of the Defendants, and neither affected in any event the accuracy

7

of the test and calibration results which are displayed in numerical form and reviewed by a trained operator.

¶12    The same holds true for a variety of other alleged "defects" Defendants delineate, including the Intoxilyzer's response to radio frequency interference, the existence of some software patches, an alleged "secret hierarchy of error-reporting known only to the programmers," the machine's failure to shut down automatically after a "diagnostic fail" message, the printing of incomplete error messages, and the high percentage of "exceptions" occasions when the machine detects a testing problem—in tests administered by the Tucson Police Department. Defendants' experts did not, and indeed did not attempt to, relate these events to Defendants' test results.[1] Additionally, as it did with the mislabeled test results, the state explained these perceived flaws and demonstrated they do not affect the reliability of the machine's test results, a showing Defendants did not refute.

¶13    The state's witnesses explained the alleged anomalies, record by record. In most cases, anomalies were the result of training exercises or quality assurance tests in which unexpected results were intentionally triggered. None of these records was shown to have any connection to any of the tests performed on Defendants.[2] And, most importantly, none

---

[1]None of the defense experts reviewed or addressed any of the individual test results or police reports pertaining to any of the specific Defendants in these consolidated actions.

[2]At oral argument, for example, counsel for Defendants distributed copies of an exhibit showing the Intoxilyzer 8000 had failed to correctly label a calibration that had been out of tolerance during a subject's test. But the numerical calibration score was printed and available for a trained operator's review, and the subject was not one of the Defendants in this case. There is no evidence in the record of how the operator responded to the result, the history of the test subject's prosecution, or how the test may have been used at trial.

8

was shown to implicate the reliability of the Intoxilyzer 8000. Mark Stoltman, a forensic toxicologist who testified for Defendants, opined that "whether [the Intoxilyzer 8000 was] working properly or not is a separate issue from how it works," and, although he might "potentially" discover additional software defects by reviewing the source code, the accuracy of the equipment would be determined by whether it passed quality assurance tests, regardless of any such discoveries.

¶14    Defendants repeatedly point out that we ordinarily "defer to the trial court with regard to any findings of fact, explicitly or implicitly made" as long as they are supported by reasonable evidence. *Francis v. Sanders*, 222 Ariz. 423, ¶ 10, 215 P.3d 397, 400 (App. 2009). "'But when a judge commits an error of law . . . in the process of reaching [a] discretionary conclusion, [she] may be regarded as having abused [her] discretion.'" *Id.*, *quoting Twin City Fire Ins. Co. v. Burke*, 204 Ariz. 251, ¶ 10, 63 P.3d 282, 285 (2003) (additional citations omitted) (first two alterations in *Sanders*). As in *Fields*, Defendants failed to establish "how, or even if, the alleged [software] deficiencies affected their test results." 196 Ariz. 580, ¶ 7, 2 P.3d at 673. Instead, they seek disclosure "merely in hope that something will turn up."[3] *Id., quoting Bettlyoun v. State*, 562 P.2d 862, 866 (Okla. Crim.

Presumably, counsel for that test subject would have the opportunity to challenge the test results through a motion in limine, cross-examination of the operator, or even presentation of expert testimony. The exhibit does not establish that Defendants have a substantial need for the software for the equipment in order to prepare their own defenses.

[3]Notably, to the extent Defendants seek to invalidate or suppress the test results, they are well short of the necessary showing. As our supreme court has observed, defendants are not entitled to a perfect test but, rather, to a reasonably reliable one. *State v. Velasco*, 165 Ariz. 480, 486-87, 799 P.2d 821, 827-28 (1990) (no requirement scientific process

9

App. 1977); *see also State v. Cano*, 154 Ariz. 447, 449-50, 743 P.2d 956, 958-59 (App. 1987) (trial court properly denied request to examine officer's personnel file based on conjecture it might contain evidence of past dishonesty). This is not a sufficient basis for ordering extraordinary disclosure, *see id.*, and the respondent judge abused her discretion in doing so.

¶15 For the foregoing reasons, we accept jurisdiction of this special action and grant relief. The respondent judge's order requiring the state to disclose the software for the Intoxilyzer 8000, in any of its versions, is vacated.

_____
PHILIP G. ESPINOSA, Presiding Judge

CONCURRING:


_____
JOSEPH W. HOWARD, Chief Judge


_____
J. WILLIAM BRAMMER, JR., Judge

_____

underlying alcohol testing be "absolutely perfect" as long as reasonably reliable); *see also Mack*, 196 Ariz. 541, ¶ 12, 2 P.3d at 104. Thus, it is not enough that Defendants identify collateral irregularities with the Intoxilyzer, they must also show any such "anomalies" cause the machine to be unreasonably unreliable.