NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

JERRY WAYNE COCKHEARN, JR., *Appellant*.

No. 1 CA-CR 22-0379
FILED 1-30-2024

Appeal from the Superior Court in Maricopa County
No. CR2010-007912-003
The Honorable Howard D. Sukenic, Judge (*Retired*)

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Tucson
By Karen Moody
*Counsel for Appellee*

Bain & Lauritano, PLC, Glendale
By Sheri M. Lauritano
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Presiding Judge James B. Morse Jr. delivered the decision of the Court, in which Judge Cynthia J. Bailey and Judge Brian Y. Furuya joined.

---

**M O R S E**, Judge:

¶1　　　　Jerry Wayne Cockhearn, Jr. appeals his convictions and sentences for three counts each of first-degree felony murder and attempted armed robbery and one count each of conspiracy to commit armed robbery and conspiracy to possess marijuana for sale.  For the following reasons, we affirm.

**FACTS AND PROCEDURAL BACKGROUND**

¶2　　　　On July 28, 2010, the Chandler Police Department ("CPD") initiated a "reversal" drug operation in which three undercover detectives posed as drug sellers.  During the transaction, a shootout erupted leaving one detective and two buyers dead, and two other detectives wounded. Seven defendants were charged with crimes relating to the incident: Doarnell Jackson, Eldridge Gittens, Jerry Cockhearn, Jr., Thandika Singleton, John Webber, Corey Royalty, and Anthony Wright.  Cockhearn and Royalty were jointly tried.  Because Cockhearn challenges the sufficiency of the evidence against him, we recite the facts in the light most favorable to sustaining his convictions. *See State v. Guerra*, 161 Ariz. 289, 293 (1989).

¶3　　　　In 2010, the CPD narcotics unit was working with a confidential informant ("CI") to make drug arrests.  On July 27, the CI received a call from someone that brokered drug deals ("Broker").  The Broker said he had buyers for 500 pounds of marijuana.  That night, Wright invited Gittens to his house on Maldonado Road in south Phoenix ("Maldonado house"), where Wright and others were discussing a "drug buy."  Gittens knew Wright and many of his friends, including Cockhearn.

¶4　　　　The next morning, the CI met the buyers near the Maldonado house.  R.T.,[1] one of the buyers, showed ("flashed") the CI a bag of money that he represented as $250,000 and asked to see a sample of the marijuana.

---

[1]　　　　We refer to the victims by their initials.

Gittens arrived at the Maldonado house later that morning—Wright, Royalty, R.T., Webber, and Singleton were there.

¶5        A CPD sergeant put a team together to proceed to flash the marijuana.  Detective C.L. and Detective B.A., posing as Mexican drug sellers, met the buyers near the Maldonado house with a bale of marijuana.  Other officers and detectives conducted surveillance and monitored the interaction.  R.T., Singleton, and Webber arrived on behalf of the buyers, and Royalty drove separately to observe the meetup.  After the marijuana flash, the buyers agreed to go forward with the deal and insisted it be done at the Maldonado house.  That afternoon, Cockhearn and M.R., Royalty's nephew, arrived at the Maldonado house.

¶6        Wright then told Gittens that the plan was to steal the marijuana from the sellers.  Gittens, Cockhearn, M.R., and Jackson were to hide in a closet—all carrying firearms.  R.T.—who was also armed—would lead the sellers into the house, at which point Cockhearn and the others would "take them down and secure the marijuana."

¶7        Detective D.B., the CI, and the Broker later met Webber and followed him to the Maldonado house.  Gittens, Jackson, Cockhearn, and M.R. positioned themselves in the closet.  But when Detective D.B. arrived, R.T. would not produce the money and expressed concern about doing the deal.  To reassure the buyers, Detectives B.A. and C.L. drove the load vehicle to the Maldonado house and flashed the load in the driveway to R.T.  The detectives then left.  R.T. opened the closet door and told Gittens, Jackson, Cockhearn, and M.R. that the sellers had left.

¶8        There was discussion about moving the deal to the Broker's house, but the buyers insisted on doing the transaction at the Maldonado house, so Detective D.B., the CI, and the Broker returned to the house.  Royalty and Wright left the Maldonado house during that time.

¶9        The sellers arrived at the Maldonado house earlier than expected and Gittens, Jackson, Cockhearn, and M.R. were not in the closet when Detective D.B. arrived.  Gittens called Wright about the sellers arriving before they were "staged," and Wright told him not to worry because "[R.T.] and Jackson and those guys" would "take care of it."  As Detective D.B. walked into the front room of the house ("pool table room"), Jackson opened a bag from a distance and flashed the money.  Detective D.B. then called in the load vehicle.

¶10        Jackson wanted to see the marijuana again so Detective D.B. led him back to the load vehicle.  Detective D.B. returned inside the house

and walked toward the pool table room where the money bag was located. As soon as he crossed the threshold, Jackson brought "a rifle up to [his] head." Detective D.B. turned, yelled, and reached for his firearm as he ran back to where Detectives B.A. and C.L. were located. Detective B.A. saw a "wall" of men approaching with guns, and a shootout erupted.

¶11 When the shooting stopped, all three detectives had been hit. Detective C.L. did not survive. Of the buyers, R.T., died of a gunshot wound to the torso and M.R. had been shot in the thigh and was bleeding heavily. Jackson, Cockhearn, Gittens, and M.R. fled the house. Gittens escaped on foot, and Cockhearn drove off in a car with Jackson and M.R. Police arrived about one minute after the shooting began. As police arrived, one of the detectives stopped the car carrying Cockhearn, Jackson, and M.R. Cockhearn and Jackson were taken into custody, but M.R. died at the scene.

¶12 Officers retrieved the bag of money at the Maldonado house. It contained bundles of genuine $1 bills sandwiched between counterfeit $100 bills.

¶13 The State initially charged Cockhearn with three counts of attempted armed robbery (Detectives B.A., C.L., and D.B.), three counts of first-degree felony murder (R.T., M.R., and Detective C.L.), and one count each of conspiracy to commit armed robbery, conspiracy to sell marijuana, conspiracy to possess marijuana for sale, attempted sale of marijuana, and sale or transportation of marijuana. The superior court dismissed three of the marijuana charges, and the jury convicted Cockhearn of the other counts after 30 days of trial during which the State introduced more than 13,000 exhibits.

¶14 The court sentenced Cockhearn to concurrent and consecutive prison terms that amount, in the aggregate, to life imprisonment with the possibility of release after 38 years. Cockhearn timely appealed. We have jurisdiction under A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A).

## DISCUSSION

### I. Challenge For Cause.

¶15 Cockhearn argues the court abused its discretion by refusing to strike Juror 18 for cause due to his prior work history with the Maricopa County Attorney's Office ("MCAO"). We review a court's decision on a motion to strike a juror for cause for an abuse of discretion. *State v. Colorado*,

256 Ariz. 97, 102–03, ¶ 23 (App. 2023); *State v. Fournier*, 256 Ariz. 33, 37–38, ¶¶ 8–9 (App. 2023).

**¶16**        A criminal defendant has a constitutional right to be tried by an impartial jury. U.S. Const. amend. VI; Ariz. Const. art. 2, § 24. A court must excuse a prospective juror "if there is a reasonable ground to believe" the juror "cannot render a fair and impartial verdict," Ariz. R. Crim. P. 18.4(b), including if the juror is "biased or prejudiced in favor of or against either of the parties," A.R.S. § 21-211(4). Accordingly, the court must strike a juror who expresses "serious misgivings about his ability" to be fair and impartial, *State v. Smith*, 182 Ariz. 113, 115 (App. 1995), but need not remove a juror who "ultimately assures the court that he can be objective," *State v. Reasoner*, 154 Ariz. 377, 384 (App. 1987). The court must consider the totality of a juror's conduct and answers, and the party challenging a juror for cause "has the burden to establish by a preponderance of the evidence that the juror cannot render a fair and impartial verdict." Ariz. R. Crim. P. 18.5(h); *see State v. Naranjo*, 234 Ariz. 233, 239, ¶ 12 (2014) ("Trial judges are in the best position to 'assess the demeanor of the venire, and of the individuals who compose it.'" (quoting *Uttecht v. Brown*, 551 U.S. 1, 9 (2007))).

**¶17**        In a questionnaire completed before jury selection, Juror 18 stated that he had interned at the MCAO. During jury selection, the State asked Juror 18 if there was "anything about that experience from working at the County Attorney's Office that . . . would impact your ability to serve . . . as a juror?" Juror 18 replied, "No." Later, out of the presence of other prospective jurors, Cockhearn asked Juror 18 several follow-up questions concerning his internship at the MCAO. In response, Juror 18 stated he was a summer intern in 2008 and 2009. Juror 18 explained that he interned with the homicide unit and sat as "second chair" on one of the cases and "questioned" witnesses. In moving to strike Juror 18 for cause, Cockhearn argued that interning at the MCAO was "evidence of bias or prejudice" and noted that Juror 18 "participated in handling an actual homicide trial" during his internship. Cockhearn did not present any other arguments for striking Juror 18. The court denied the motion, concluding that Cockhearn had not shown "why [Juror 18] should be struck for cause when the standard is fair and impartial" and that Juror 18 "evidenced no inability to be a fair and impartial juror" nor "illustrate[d] any bias or prejudice."

**¶18**        On appeal, Cockhearn claims that his charges arose from events that occurred around the time that Juror 18 interned at the MCAO and argues that the "judge failed to question [Juror 18] sufficiently" and "to

properly vet" Juror 18 regarding his relationships with the attorneys, officers, professionals, and staff members at the MCAO. Cockhearn also argues that Juror 18's "inside knowledge into the homicide unit" potentially caused Cockhearn to "have an unfair trial," and that Juror 18 may not have been impartial. But the court noted that Juror 18 interned at the MCAO *before* the events of the case arose and asked all prospective jurors if they knew any members of the MCAO, to which all jurors had "no response[s]," including Juror 18. And even if Juror 18 knew a member of the MCAO, it would not have automatically barred him from serving on the jury, *State v. Acuna Valenzuela*, 245 Ariz. 197, 210, ¶ 32 (2018), unless he was "related by consanguinity or affinity within the fourth degree" or "biased or prejudiced in favor of or against either of the parties," A.R.S. § 21-211(3)–(4). To that point, when asked by the State whether his experience interning at the MCAO would impact his ability to serve as a juror, Juror 18 stated that it would not. And nothing in the record suggests that Juror 18 was related to or had an affinity for any party or members of the MCAO. Further, in response to a question from the State about whether Juror 18 had any "ill feelings" toward defense attorneys, Juror 18 responded, "[a]bsolutely not. I had a wonderful defense attorney talk to my group once and explain exactly the importance of a defense attorney."

¶19 Citing *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984), Cockhearn further argues that "the appropriate standard for determining juror bias is whether the juror's partiality would prevent a fair and impartial trial" but fails to show how Juror 18's alleged partiality prevented him from having a fair and impartial trial. Unlike the juror in *McDonough Power Equipment*, Juror 18 disclosed his internship at the MCAO, indicated that his experience there would not impact his ability to serve as a juror, and disclaimed any "ill feelings" towards defense attorneys. *Contra* 464 U.S. at 554 (noting "demonstrated bias" in voir dire responses "may result in a juror being excused for cause" while "hints of bias" may not be sufficient).

¶20 In denying Cockhearn's motion, the court concluded that Juror 18 did not "illustrate any bias or prejudice" because "[the court's] notes would have reflected it." We defer to the court's findings as it was ideally situated to observe Juror 18's responses and demeanor. *Acuna Valenzuela*, 245 Ariz. at 210, ¶ 30. And despite Cockhearn's contrary arguments, the court was not required to strike Juror 18 merely because he interned at the MCAO *before* the events in question and over a decade before trial. *See State v. Hoskins*, 199 Ariz. 127, 139, 141, ¶¶ 37, 48 (2000) (stating that any prejudice "will not be presumed but must appear affirmatively from the record"); *State v. Trostle*, 191 Ariz. 4, 13 (1997) (finding no presumption that potential

jurors would be biased having served on a jury that convicted in a similar type of case or having had personal experiences with violent crime). Thus, the court did not abuse its discretion in denying Cockhearn's motion to strike Juror 18 for cause. *See State v. Jimenez*, 255 Ariz. 550, 554, ¶¶ 10, 13 (App. 2023) (noting the court acted within its broad discretion in finding the juror's assurances of impartiality credible notwithstanding the juror's law enforcement experience).

## II.     Peremptory Challenges.

**¶21**          Cockhearn argues Arizona's removal of peremptory challenges violated his right to a trial by a fair and impartial jury. *See* Ariz. R. Crim. P. 18.4 (abolishing peremptory challenges in jury selection, effective January 1, 2022).

**¶22**          Although we generally review constitutional issues de novo, *State v. Dann*, 220 Ariz. 351, 360, ¶ 27 (2009), because there is no indication that Cockhearn raised this issue before the superior court, we review for fundamental error, *State v. Larin*, 233 Ariz. 202, 208, ¶ 14 (App. 2013) (failing to raise an issue below "waives the right to seek relief for all but fundamental, prejudicial error"). "The defendant must establish error occurred that was fundamental in nature and resulted in prejudice." *Id.* Cockhearn fails to cite supporting authority,[2] provide record citations to

---

[2]          Cockhearn cites a law review note that discusses Arizona's elimination of peremptory strikes. *See Criminal Procedure – Jury Selection – Arizona Supreme Court Abolishes Peremptory Strikes in Jury Selection. – Order Amending Rules 18.4 and 18.5 of the Rules of Criminal Procedure, and Rule 47(e) of the Rules of Civil Procedure, No. R-21-0020 (Ariz. 2021)*, 135 Harv. L. Rev. 2243, 2244 (2022). But the note does not support his argument that eliminating peremptory strikes violates constitutional rights. *See id.* at 2243–44, 2248–50 (acknowledging that the Arizona Supreme Court was within its authority to eliminate peremptory strikes and calling the decision "laudable" and "bold" but arguing that the supreme court should have made expanded voir dire mandatory rather than permissive). The lack of citation to any other authority is unsurprising. *See Rivera v. Illinois*, 556 U.S. 148, 152 (2009) ("States may withhold peremptory challenges 'altogether without impairing the constitutional guarantee of an impartial jury and a fair trial.'" (quoting *Georgia v. McCollum*, 505 U.S. 42, 57 (1992))); *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988) (rejecting "the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury"); *State v. Hickman*, 205 Ariz. 192, 196, ¶ 21 (2003) (adopting the principles set forth in *Ross v. Oklahoma*).

show he raised the issue before the superior court, or demonstrate how the elimination of peremptory strikes prejudiced his defense. Therefore, he waives this argument. *See id.*; *Ritchie v. Krasner*, 221 Ariz. 288, 305, ¶ 62 (App. 2009) (finding jury-selection issue waived because the appellant "did not . . . consider the jury selection worthy of an argument supported by authority in his opening brief").

## III.    Pretrial Motion.

**¶23**        Cockhearn argues the court erred in refusing to allow him to interview a potential witness prior to ruling on a pretrial motion. We disagree.

**¶24**        The "court has broad discretion over discovery matters, and we will not disturb its rulings on those matters absent an abuse of that discretion." *State v. Fields*, 196 Ariz. 580, 582, ¶ 4 (App. 1999). Although the court is in the best position to rule on discovery matters, it "abuses its discretion when it misapplies the law or predicates its decision upon irrational bases." *Blazek v. Superior Court*, 177 Ariz. 535, 537 (App. 1994).

**¶25**        In October 2021, Cockhearn submitted various disclosure requests, one of which included investigation records regarding a detective serving as a case agent for the State. The State disclosed copies of the reports and declarations concerning the detective and later filed a motion in limine to preclude any mention of the detective's involvement in a 2020 case referenced in its disclosures. Cockhearn then requested a limited interview with the detective regarding the 2020 case followed by a substantive case interview. In response, the State provided there was "nothing further to disclose" regarding the detective and objected to a "limited" interview but provided that the detective would be available for a full interview. But Cockhearn insisted on a "bifurcated interview" as he did not have time to prepare for a full interview and objected to the State's motion in limine.

**¶26**        After argument, the court acknowledged Cockhearn's concern about the detective's "reputation or character for truthfulness or untruthfulness" and request for a limited interview. But the court noted that interviewing the detective about the State's disclosures would lead to a "rabbit hole" and create "non-issues that are going to delay things" as the detective made no arrests nor submitted any charges in the 2020 case and "just made suggestions" about the evidence in that case. Cockhearn further argued that he needed to conduct a limited interview because the individuals who issued the reports never interviewed the detective. The

court denied Cockhearn's request for a limited interview but allowed Cockhearn to conduct a full interview and further concluded that Cockhearn may cross-examine the detective regarding an earlier 2012 ruling and a recording that related to his character for truthfulness and bias.

**¶27** Relying on *Brady v. Maryland*, 373 U.S. 83 (1963), Cockhearn argues that because the court did not allow him "to interview the witness as to potentially new *Brady* material," his "constitutional right to confront the evidence against [him] and present an effective defense" was violated. Cockhearn also argues that the court violated his constitutional "right to meaningful cross-examination on *Brady* issues" when it limited the cross-examination of the witness to evidence bearing on the witness's character for truthfulness and bias.

**¶28** There are three components to a due process violation based on the suppression of evidence: (1) the evidence is favorable to the accused, (2) the prosecution suppressed the evidence, and (3) the evidence is "material" in that it resulted in prejudice. *Brady*, 373 U.S. at 87; *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

**¶29** The record confirms that the State had "nothing further to disclose" regarding the detective, and aside from the limited interview, Cockhearn does not argue that the State failed to make any other disclosures regarding the detective. Cockhearn's argument that the denial of his request to conduct a limited interview suppressed "potentially new *Brady* material" is mere speculation. *See State v. Acinelli*, 191 Ariz. 66, 71 (App. 1997) (finding that "the defendant failed to demonstrate materiality" as his claims of finding impeachment evidence in government personnel files were "mere speculation" (quoting *United States v. Navarro*, 737 F.2d 625, 631 (7th Cir. 1984), *cert. denied*, 469 U.S. 1020 (1984))). When the court asked whether the limited interview would lead to evidence probative of the detective's character, Cockhearn responded that it would help to "make the proper argument within the scope of what we have available to us." And when the court later asked what more could be discovered that was not already in the disclosed reports, Cockhearn indicated that the answer "goes back to the cautious need for an interview." Without providing more, Cockhearn fails to show that the State suppressed any evidence or that he suffered prejudice based on the court's denial of a limited interview. *See id.* ("A due process standard which is satisfied by mere speculation would

convert *Brady* into a discovery device and impose an undue burden upon the . . . court." (quoting *Navarro*, 737 F.2d at 631)); *cf. State v. Bracy*, 145 Ariz. 520, 527–28 (1985) (finding that an untimely disclosure was not a *Brady* violation as "the defendant could not have suffered any prejudice" because "the evidence was never presented at trial").

**¶30**       Further, the detective never testified so Cockhearn did not suffer any prejudice from the court's cross-examination limitations. *Bracy*, 145 Ariz. at 527–28. Thus, the court did not abuse its discretion in denying Cockhearn's request for a limited interview before granting the State's motion in limine and limiting cross-examination to the evidence in its ruling.

## IV.    Sufficiency of Evidence.

**¶31**       Cockhearn argues the "State presented insufficient evidence for any reasonable trier of fact to find adequate and sufficient evidence to support a conviction." Specifically, Cockhearn argues that the State failed to "tie" him to (1) the crime as an accomplice with regards to the felony murder convictions; (2) "the firefight in the house during the drug deal that resulted in the three deaths"; and (3) the "alleged planned offenses with the requisite knowledge and intent."

**¶32**       Sufficiency of the evidence is a question of law we review de novo. *State v. West*, 226 Ariz. 559, 562, ¶ 15 (2011). In considering the sufficiency of the evidence, we view all facts in favor of the verdict and resolve all evidentiary conflicts against the defendant. *State v. Pena*, 235 Ariz. 277, 279, ¶ 5 (2014). Our review is confined to determining whether there is substantial evidence to support the verdict. *Id.* "Substantial evidence is more than a mere scintilla and is such proof that reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt." *State v. Ellison*, 213 Ariz. 116, 134, ¶ 65 (2006) (cleaned up). If reasonable people "could differ as to whether the evidence establishes a fact in issue, that evidence is substantial." *State v. Mincey*, 141 Ariz. 425, 432 (1984). Further, in conducting our review, we compare the evidence "against the statutorily required elements of the offense," *State v. Brock*, 248 Ariz. 583, 592, ¶ 22 (App. 2020) (quoting *State v. Pena*, 209 Ariz. 503, 505, ¶ 8 (App. 2005)), and do not "reweigh the evidence to decide if [we] would reach the same conclusions as the trier of fact," *State v. Barger*, 167 Ariz. 563, 568 (App. 1990). Substantial evidence may be direct or circumstantial. *Pena*, 209 Ariz. at 505, ¶ 7.

¶33        A defendant acts as an accomplice if the defendant has "the intent to promote or facilitate the commission of an offense" and either "[s]olicits or commands another person to commit the offense," "[a]ids, counsels, agrees to aid or attempts to aid another person in planning or committing an offense," or "[p]rovides means or opportunity to another person to commit the offense."  A.R.S. § 13-301.  A defendant is criminally responsible for the conduct of another if the defendant "is an accomplice of such other person in the commission of an offense including any offense that is a natural and probable or reasonably foreseeable consequence of the offense for which the person was an accomplice."  A.R.S. § 13-303(A)(3).  A defendant is guilty of attempt to commit armed robbery if the defendant acts as an accomplice to one who attempts, while armed with a deadly weapon or simulated deadly weapon, to take the property of another from his person or immediate presence and against his will by threatening or using force against such other person.    A.R.S. §§ 13-1001(A)(2), -1902(A), -1904(A)(1).  A defendant is guilty of first-degree felony murder if "in the course of and in furtherance of" the attempt to commit armed robbery, the defendant's confederate "or another person causes the death of any person."  A.R.S. § 13-1105(A)(2).  "A death is 'in furtherance' of an underlying offense if the death resulted from any action taken to facilitate the accomplishment of the felony."  *State v. Herrera*, 176 Ariz. 21, 29 (1993).  "The only intent required for felony murder is the intent required to commit the underlying felony."  *State v. Rios*, 217 Ariz. 249, 251, ¶ 8 (App. 2007).

¶34        Substantial evidence supports the verdicts for attempted armed robbery and felony murder.  Cockhearn did not just agree to the plan to commit armed robbery; he also acted as an accomplice to the men tasked with carrying out the crime—R.T., Jackson, Royalty, Gittens, and M.R.  The evidence shows that Cockhearn aided his confederates in committing the offense by arming himself and hiding in a closet under the stairs with Gittens, M.R., and Jackson with the intent to commit armed robbery.  Even after R.T. let them out of the closet to wait, Cockhearn remained at the house until the sellers returned and eventually went to the pool table room where Jackson later pulled out a weapon.  Three people died "in the course of and in furtherance of" the attempted armed robbery because those deaths directly resulted from Jackson pointing a rifle at Detective D.B. to steal the marijuana.  A.R.S. § 13-1105(A)(2); *see State v. Howes*, 109 Ariz. 255, 257 (1973) ("We have . . . held that a person engaged in the commission of the crime of robbery which calls into action defensive forces against him the activity of which results in the death of a human being is guilty of murder in the first degree.").  And because the only intent required for felony murder is the intent required to commit the underlying felony, there is

substantial evidence to support Cockhearn's felony murder convictions. *See Rios*, 217 Ariz. at 251, ¶ 8.

¶35 Cockhearn also argues the State failed to "tie" him to the firefight in the house during the drug deal that resulted in the three deaths. Cockhearn claims that neither Detective D.B. nor Detective B.A. testified that Cockhearn was present in the house during the firefight or involved in the drug deal. His argument is unconvincing. In Arizona, "the jury is tasked with weighing the evidence and determining the credibility of the witnesses." *State v. Allen*, 253 Ariz. 306, 341, ¶ 109 (2022) (cleaned up). And "one witness, if relevant and credible, is sufficient to support a conviction." *State v. Montano*, 121 Ariz. 147, 149 (App. 1978). Gittens not only testified that Cockhearn planned to hide in the closet while armed to "secure the marijuana," but that he tested a drug bale to ensure it was marijuana and then moved into the pool table room where Jackson pointed a rifle at Detective D.B. Although Detective B.A. did not use the defendants' names when describing the drug deal, his description of Jackson matched Gittens's description and indicated that all the "Black males" with Jackson were armed as they approached him and Detective C.L. Detective D.B. described similar events.

¶36 In addition to Gittens's testimony, other evidence created a cohesive portrait of Cockhearn's criminal involvement. Viewing the totality of admissible evidence, including Cockhearn's attempt to drive away with Jackson, M.R., and multiple guns, a reasonable person could find beyond a reasonable doubt that Cockhearn committed the charged crimes. *See State v. Fulminante*, 193 Ariz. 485, 494, ¶¶ 26–28 (1999) (finding sufficient evidence to sustain a guilty verdict based on "a web of suspicious circumstances tight enough that a reasonable person could conclude, beyond a reasonable doubt, that Defendant was the perpetrator").

¶37 Cockhearn does not specifically argue that there was insufficient evidence to support his convictions of conspiracy to commit armed robbery or conspiracy to possess marijuana for sale. Rather, he argues that the State generally failed to link him to "the events and the alleged planned offenses with the requisite knowledge and intent" and that the State failed to present evidence that he "communicated with any of the co-conspirators," was involved in the initial planning or negotiations, or participated in the drug sale.

¶38 A defendant is guilty of conspiracy to commit armed robbery if the defendant intends to promote or aid the commission of armed robbery, the defendant agrees with one or more persons that one of them

or another person will commit armed robbery, and one of the conspirators commits an overt act in furtherance of the armed robbery. A.R.S. §§ 13-1003(A), -1904(A). Evidence was presented that Cockhearn agreed with, and participated in, the plan to rob the sellers of marijuana by (1) hiding in the closet with other armed buyers to take down the sellers; (2) remaining at the house after the sellers got "spooked"; and (3) moving to the pool table room when the sellers arrived. Detective D.B. also testified that he saw Cockhearn in the pool table room with Jackson, who later pointed a rifle at him. Cockhearn's intent to aid in the commission of the armed robbery and any planning or communication Cockhearn had with his co-conspirators beforehand can be inferred from him being at the house where the buyers planned to rob the sellers. Viewed in the light most favorable to sustaining the conviction, there was substantial evidence that Cockhearn committed conspiracy to commit armed robbery.

¶39 A defendant is guilty of conspiracy to possess marijuana for sale if the defendant intends to promote or aid the possession of marijuana for sale, the defendant agrees with one or more persons that one of them or another person will commit possession of marijuana for sale, and one of the conspirators commits an overt act in furtherance of the offense. A.R.S. §§ 13-1003(A), -3405(A)(2). As described above, the evidence shows that Cockhearn agreed with others to commit a plan to steal 500 pounds of marijuana when he met the other buyers at the house earlier that day. *See State v. Harrison*, 111 Ariz. 508, 510 (1975) (recognizing intent to sell can be inferred from large quantities and the nature of its packaging). Such evidence is sufficient to establish that Cockhearn committed conspiracy to possess marijuana for sale.

**CONCLUSION**

¶40 We affirm Cockhearn's convictions and sentences.



AMY M. WOOD • Clerk of the Court
FILED:     AA

13